**237 A.2d 309.**

STATE *vs.* BARRY K. LEAVITT.

JANUARY 16, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

274

Powers, J. This indictment for first degree murder was tried to a superior court justice and a jury which returned a verdict of guilty as charged. After the denial of his motion for a new trial and within the time and manner prescribed by G. L. 1956, §9-24-17, as amended, the defendant duly commenced prosecution of a bill of exceptions, for the purpose of securing in this court a review of assigned errors, allegedly amounting to denials of due process.

A summary of the salient circumstances which led to the arrest, indictment and conviction of defendant is desirable, if not indispensable, to an intelligent comprehension of the issues presented for our consideration.

On December 1, 1963, defendant, his wife and infant son moved into the second floor tenement of a house located at 40 Amsterdam street in Providence. At that time, and for some time prior thereto, the first floor tenement was occupied by Mrs. Elizabeth Pono and her three school-age children of whom Michael, age 12, was the eldest.

The first floor apartment had a front door entrance, which, however, was always locked and not used by the Ponos. They, the Leavitts and a Mrs. D'Arezzo who lived on the third floor, used a common entrance at the rear of the house. This rear door opened into a hallway on the left side of which was the Pono kitchen door, while to the right were the stairs that led to the second and third floor tenements.

At about eight o'clock on the morning of March 23, 1964, defendant, his wife and infant son drove to the home of Mrs. Leavitt's mother at 3 Samoset avenue in Providence, where the boy was left in the care of his grandmother. The defendant then drove his wife to the Rhode Island Hospital where she was employed in office work. About 8:20 they arrived at the hospital where Mrs. Leavitt reported for work and defendant drove back to the Amsterdam street house. He reached there about 8:45 and was observed entering by the postman with whom defendant exchanged greetings.

Mrs. Pono left her home on the morning in question at or about 6:45. A registered nurse, she was in service at the Jane Brown Hospital from seven in the morning until three in the afternoon. Before leaving, she awakened the three children, saw that they were up and preparing for school and gave Michael a five-dollar bill and some change. A Mrs. Schroder who had been regularly engaged to be with the children when Mrs. Pono was not at home had not arrived when Mrs. Pono left for work.

Before leaving she told Michael that he was to go to the

store to buy bread and milk. It was for these purchases that she gave him the change. The five-dollar bill was to pay for the children's weekly school lunch tickets.

Mrs. Pono arrived at the hospital on time and after ministering to her patient, called home where she talked with Michael at about 8:15. She learned that he had been to the store, but that Mrs. Schroder had not arrived.

It is further established that Michael duly arrived at school. There he found that he had forgotten to bring the money for the school luncheon tickets. Between 8:45 and 8:50 he was given permission by a school employee in the office of the principal to return home for the school luncheon money with the understanding that he would be back in school by 9 o'clock.

It was defendant's story to the police that shortly after reaching home about 8:45, he was in his kitchen on the second floor when he heard sounds of the downstairs doors being closed. It seemed to him that he first heard the outside door close, followed by the closing of an inside door. Very shortly thereafter he heard the same sounds repeated and in the same order. Immediately thereafter he heard high pitched screaming coming from downstairs. He left his kitchen and started down to investigate. When he reached the second or third step from the bottom, defendant saw a man come out of the Pono kitchen. At the same time defendant lost his footing and fell as the man fled. On getting up he became aware that his left hand was bleeding profusely.

Continuing his statement to the police, defendant related how he attempted to enter the Pono kitchen, but was unable to do so because the door was locked.

The defendant then drove to the house on Samoset avenue. He sketchily related his experience to his mother-in-law and told her to call the Providence police. She did so and defendant spoke with the officer on duty.

Officer Thomas Gibalerio received defendant's call at about 9:18. Acting on defendant's information, officer Gibalerio dispatched a police car and the rescue squad to the Samoset avenue address. At the same time other police officers were sent to the house at 40 Amsterdam street.

Within minutes of defendant's call, a police officer as well as a member of the firemen's rescue squad were at the Samoset avenue address. The defendant received emergency aid and was then taken to the accident room of the Roger Williams General Hospital for more thorough examination and treatment. These ministrations completed, he agreed to accompany the police officers to the central station to assist in the investigation of the assault on defendant by means of questioning and possible identification of his assailant through photographs in the police files.

Meanwhile, about simultaneously with the arrival of the police officer and rescue squad at the Samoset avenue address, Sergeant Joseph F. Nerney and two other police officers reached the Amsterdam street house to which they had been directed by officer Gibalerio. They found the front door locked, but the door to the rear entrance ajar. Entering, they observed a substance resembling blood on the floor of the hallway and on the stairs leading up to the second floor.

They found the door to the Pono kitchen closed but not locked. Inside the kitchen, the three officers discovered the body of Michael Pono, fully clothed, lying on the floor. The boy's jacket and trousers appeared to be bloodstained and torn. There was also evidence of blood on the kitchen floor, walls and on a telephone stand in one of the bedrooms.

Immediately following these discoveries, Sergeant Nerney called police headquarters on the car radio, reported on the conditions found and requested assistance. In response to this call, Captain John Eddy, commander of the detective division, accompanied by Lieutenant Vincent J. O'Connell, left headquarters at approximately 9:25. Also

responding were Lieutenant Stanley Andrukiewicz, several detectives, technicians from the bureau of criminal identification, and Earl J. Higham, Jr., of the rescue squad. He felt the boy's wrist, found no pulse, but called the Rhode Island Hospital. Doctor Brian C. Carroll, connected with the accident room of that hospital, responded to the call and pronounced the boy dead.

Doctor Joseph A. Palumbo, a county medical examiner, arrived at the Amsterdam street house about 10:30. On turning the body over, he noticed on the floor what he described as an "elongated washer" having the consistency of leather. Near the washer there was a basket of clean clothing, some of which had spilled over onto the floor. Simultaneously with the finding of the washer, Dr. Palumbo and the police noticed a man's wrist watch partially concealed in the clothing on the floor. The watch had a metal expansion bracelet which had become separated from the watch at one end. The watch and bracelet, as well as the washer, were turned over to Captain Eddy who was present at their discovery.

His investigation at the scene completed, Dr. Palumbo ordered the body taken to the state morgue where an autopsy was performed by Dr. Harold Beddoe, the state medical examiner. It disclosed that the boy had sustained fourteen stab wounds, caused by a pointed, sharp-edged instrument. The heart and lungs had been penetrated in the stabbing and Dr. Beddoe attributed death to hemorrhage and shock resulting from multiple stab wounds.

During the investigation conducted by Dr. Palumbo and the police in the Pono kitchen, Lieutenant O'Connell learned that another victim of the stabbing had gone from the Amsterdam street house to a house at 3 Samoset avenue where the report to the police had originated. About ten minutes to eleven, Lieutenant O'Connell left the Amsterdam street house and went to the 3 Samoset avenue address. There he talked with two police officers, who pointed out

the car driven by the informant from the Amsterdam street house to 3 Samoset avenue. Lieutenant O'Connell ordered the car towed to the garage at the police station, as a matter of policy, not knowing to what extent the car might be significant.

The lieutenant then went to police headquarters where he learned from Captain Eddy that the informant's name was Leavitt and that he was then being questioned at the station regarding the reported stabbing. Joining in the questioning of Leavitt, Lieutenant O'Connell learned that he was claiming not to have entered the Pono kitchen because the door was locked. Knowing this to be contrary to the fact that Sergeant Nerney and his men had found the kitchen door unlocked, Lieutenant O'Connell concluded that Leavitt was a prime suspect. Leaving defendant momentarily, he went to Captain Eddy's office, picked up the watch and returned to the room where defendant was being questioned.

At this point in the presentation of the state's case to the jury, Lieutenant O'Connell testified that on returning from Captain Eddy's office, he advised defendant that he was under no obligation to answer any further questions; that anything he did say from thereon could be used in evidence against him; and that he could have the assistance of counsel if he so desired. The lieutenant further testified that defendant then replied that he was aware of his rights.

Continuing, O'Connell testified that he showed the watch to defendant who identified it as his, but stated that he did not know how it came to be found in the Pono kitchen, repeating that he had not been in the Pono kitchen because the door was locked. It was then that Lieutenant O'Connell informed defendant that he was charged with the murder of Michael Pono and ordered him to empty his pockets. The defendant did so, placing his belongings on a table in front of him. Among his possessions were the keys to his car.

Continuing his testimony in the presence of the jury, Lieutenant O'Connell related how Lieutenant Andrukiewicz, who had been entering and leaving the room during the questioning, again returned and said to defendant, "I'd like to look your car over." According to O'Connell, defendant said, "Sure go ahead," and tossed the keys from the table to Andrukiewicz who then left. Returning shortly, Andrukiewicz spoke with O'Connell, who, according to his testimony, informed defendant that they had found the knife. At this, O'Connell testified, defendant became excited and asked to see his wife who was already at the police station since, when defendant made his request, Mrs. Leavitt was immediately brought into the room where defendant was being questioned. According to O'Connell this occurred about noon and it is Mrs. Leavitt's testimony that she arrived in the station at 12:10.

When Mrs. Leavitt was ushered into defendant's presence he reputedly told her that he was charged with the murder of Michael Pono and that the police had found the knife. On hearing this, Mrs. Leavitt, it is O'Connell's testimony, turned around and left the room.

Continuing with Lieutenant O'Connell's testimony in the presence of the jury, Lieutenant Andrukiewicz then showed defendant a plastic bag containing the separated handle and blade of a knife, which from the adornment of a bird on the handle, defendant reputedly identified as his.

At this point in the direct examination of Lieutenant O'Connell, a bench conference was requested by counsel for defendant. Throughout the questioning of Lieutenant O'Connell relative to defendant having been advised of his rights, the subsequent questioning about an introduction in evidence of the watch, as well as defendant's reputed comment to his wife and identification of the knife, defense counsel was objecting and taking exceptions to the trial justice's adverse rulings to these objections as well as to subsequent motions to strike. None of these exceptions,

however, is either orally argued or briefed, and these rulings of the trial justice are therefore treated as though not having been brought upon the record for our consideration. *State* v. *Cucca,* 102 R. I. 95, 228 A.2d 572 (1967), and *State* v. *Sliney,* 101 R. I. 423, 224 A.2d 603 (1966).

At the bench conference which is fully reported, defense counsel, anticipating that the state would now attempt to introduce the knife in evidence, moved for a voir dire examination in the absence of the jury for the purpose of establishing that the knife was the fruit of an illegal search, and as such inadmissible. The state offered no objection and defendant's motion was granted.

There then followed some two and one-half days of testimony received by the trial justice in the absence of the jury. The state's witnesses—those who participated in or who were present at the questioning of defendant from the time Lieutenant O'Connell joined in the questioning—were examined and cross-examined as to: the time and manner that defendant was advised of his rights; the voluntariness of responses thereafter; his responses to the police request for permission to search his car; and his identification of the knife and as to physical or psychological duress. All testified that defendant had been advised in the manner related by Lieutenant O'Connell; that his responses thereafter, including his consent to searching the car resulting in the finding of the knife in the trunk, were voluntary; and that the questioning was unaccompanied by force, intimidation or promises.

The defendant, on the other hand, stated flatly that he was at no time advised of the constitutional safeguards against self-incrimination. Specifically queried, he testified that he had not been advised of his right to remain silent; that he had not been told that anything he said could be used against him; and that he had not been informed of his right to the assistance of counsel. He offered no testimony in contradiction of the state's witnesses' assertions that he

consented to the search of the car and he was likewise silent on the issue of physical or psychological duress.

The defendant's wife, however, categorically contradicted the state's witnesses as to defendant's statements to her. She insisted that in her presence he repeatedly demanded that he be permitted to talk with his lawyer, naming a member of the Massachusetts bar. It was her testimony that she asked permission to call this attorney from the police station, but was told that she could not make a long distance call. We note parenthetically that arriving at the police station ten minutes past noon, she called the attorney in question from the home of her mother at about 1:30 p. m. Mrs. Leavitt testified in some detail as to an atmosphere of marked hostility pervading the police station where she twice talked with defendant; claimed to have been browbeaten; and implied that from personal observation the questioning of her husband reeked of intimidation and physical abuse.

At the conclusion of the voir dire examination, the trial justice found as a fact that defendant had been seasonably and knowingly advised of his rights within the meaning of the fifth and sixth articles of amendment to the federal constitution and ordered the jury returned. The defendant duly excepted to this ruling. It is the only one of the numerous exceptions taken and allowed by the trial justice that defendant has briefed and orally argued. He has treated it as though it encompasses all of the exceptions taken to rulings affecting fourth, fifth and sixth amendment guarantees.

For the reason that it is our considered judgment that the voir dire examination must be considered by us as though it were a motion to suppress, we feel constrained to give this defendant the benefit of the unorthodox approach taken by counsel.

In *State* v. *Cairo*, 74 R. I. 377, 60 A.2d 841 (1948), this court held in effect that the exclusion of illegally obtained

evidence must be sought procedurally by a motion to suppress heard prior to trial. However exclusive this procedure may have been when that case was decided and in keeping with orderly procedure may obviously remain, it is in the last analysis a rule of procedure and is governed by the decisions of the United States supreme court when the effect of state procedural rules is to deny a defendant fundamental safeguards guaranteed by the United States constitution. See *Fay* v. *Noia*, 372 U. S. 391, 83 S. Ct. 822, 9 L. Ed.2d 837 (1963), and *Henry* v. *Mississippi*, 379 U. S. 443, 85 S.Ct. 564, 13 L. Ed.2d 408 (1965).

With the return of the jury, Lieutenant O'Connell resumed direct examination. He, and the state's witnesses who followed, proceeded to adduce evidence which, if the voir dire examination had resulted in a ruling adverse to the state, would not have been before the jury.

Lieutenant Andrukiewicz and others related defendant's alleged consent to the search of the car, the finding of the broken knife and defendant's alleged identification of it as belonging to him.

The record establishes that the leather washer and the knife handle and blade were delivered to the Federal Bureau of Investigation's scientific laboratory for microscopic examination and study. Jay Cochran, Jr., of that laboratory, a qualified expert in tool mark identification and fracture analysis, described the scope of these qualifications in detail and testified that in his opinion the washer, blade and handle were originally component parts of the same knife.

It was through this witness that the washer, blade and handle, previously marked for identification, were admitted as full exhibits. The significance for the jury of the expert testimony that the washer which was found beneath the boy's body had been part of a knife, the blade and handle of which were found in the rear of the trunk of defendant's car, requires no elaboration.

Further, defendant's ownership of the wristwatch that was found among the clothing in the Pono kitchen was established beyond doubt through the sales records and testimony of employees at the store where the watch had been purchased.

The case in chief for the defense consisted of the testimony of defendant, his wife and two character witnesses. The testimony of the latter is without significance to this appeal and requires nothing by way of specific mention.

In her testimony Mrs. Leavitt repeated for the benefit of the jury her opinion of the atmosphere of intimidation which she encountered at the police station; her husband's request that she call counsel on each of the two occasions that she talked with him; and further testified as to matters having no materiality in respect to the issues raised for our consideration.

The defendant in his testimony categorically denied having been advised that it was his right to remain silent; that anything he did say could be used against him; or that he was entitled to the assistance of counsel if he wished. He corroborated his wife's testimony that on the two occasions when they spoke at the police station, he repeatedly urged her to call a Massachusetts attorney with whom they were both acquainted.

Although not specifically asked, defendant implied that he had neither been asked permission nor consented to search of his car. It was his version that he was merely asked for the car keys, to which request he replied, "I reached down on the table and asked him if going to drive to be careful of it, because the clutch had been burned, and I tossed the keys to them." He denied having identified the knife.

In direct examination defendant testified that after the stranger seen leaving the Pono kitchen had left through the downstairs rear door, defendant picked himself up and noticed that his left hand was bleeding profusely. He also

noticed that the Pono kitchen door was open, so he entered. There he discovered the body of Michael Pono, thought of taking him to the hospital in his car, but became sick. He then went to the Pono telephone thinking to call the police, refrained because he became frightened, picked up a child's T-shirt from the clothing on the floor, which he wrapped around his bleeding hand, and left. This testimony contradicted the police version of the story related to them during the investigation at the police station.

On cross-examination, defendant conceded that his story to the police was that to which they testified. Specifically asked, he admitted that he had lied to the police, giving as his reasons that he became frightened and did not wish to become involved.

This admission stands in the record as the only established instance of lying by anyone whose credibility was in issue for the jury's consideration. Considered in connection with a portion of the trial justice's instructions to the jury, this circumstance so taints the trial, defendant contends, as to call for a new trial even though the alleged error has not been brought on the record by an exception duly taken and preserved.

Having repeatedly charged the jury that the credibility of witnesses was exclusively their province, the trial justice proceeded to suggest possible aids in evaluating the weight to be given to the testimony of the respective witnesses. In the course thereof, he stated:

> "There is an old motto in the law which comes from latin, 'Falsus in uno, falsus in omnibus', and if you remember your high school latin well enough, you will recall that means, 'False in one thing, false in all'. And I ask you to consider whether you should apply that motto in your consideration of the testimony of any of the witnesses in this case."

The defendant argues that, in light of his admission that he had lied to the police, the quoted remarks of the trial

justice deprived him of fair consideration as a credible witness.

An examination of the authorities discloses that, although there is a division of opinion as to the propriety of trial justices admonishing juries that a witness found to be false in one thing may be considered by them to be false in all respects, authority holds that even in criminal cases such an instruction does not necessarily constitute prejudicial error. *State* v. *Barnes,* 274 Mo. 625, 204 S.W. 267 (1918); *State* v. *Jones,* Mo., 365 S. W. 2d 508 (1963); *United States* v. *Rutkin,* 189 F.2d 431 (1951); *State* v. *Ernst,* 32 N. J. 567, 161 A.2d 511 (1960). In holdings to the contrary, however, see *Crawford* v. *State,* Miss., 54 So.2d 230 (1951), and *State* v. *Bonner,* 241 Ore. 404, 406 P.2d 160 (1965).

Nevertheless, defendant argues forcefully that by reason of the exact language used by the trial justice, error is peculiarly present. Acknowledging that the trial justice repeatedly told the jury that the fact-finding power, necessarily involving the credibility of witnesses, was their exclusive province, defendant stresses what he insists makes for a conflict confusing to the jury. It is, that having also been told that they were bound to take the law as he gave it, twelve reasonable laymen, prepared by their superficial contacts with the law to think of it as commonly phrased in Latin expressions, would conceive the statement, "There is an old motto in the law * * * 'Falsus in uno, falsus in omnibus,' " as a rule of law by which they were bound, rather than as a suggestive aid in evaluating credibility. Though ingenious, we think this argument, when the instruction objected to is read in its entirety, is more plausible than sound. This is not to say, however, that such an instruction is advisable, let alone desirable. It serves no useful purpose and should be avoided. Indeed, in 3 Wigmore, Evidence (3d ed.), §1008, at 675, that learned text writer observes: "It is also in practice pernicious, first, because there is frequently a misunderstanding of its proper

force, and secondly, because it has become in the hands of many counsel a mere instrument for obtaining new trials upon points wholly unimportant in themselves."

In the instant case, however, we conclude that the trial justice should not be faulted. We are primarily so motivated because no request was made of him to clarify the challenged instruction before giving the case to the jury. Had defendant done so and the trial justice refused, exception could have been duly taken and the question thus properly brought on the record for our consideration. *State v. Kemp,* 37 R. I. 572, 94 Atl. 429 (1915); and see *State v. Quattrocchi,* 103 R. I. 115, 235 A.2d 99 (1967).

We turn then to a consideration of the alleged errors brought on the record by what we have heretofore referred to as defendant's encompassing exception to the ruling of the trial justice at the conclusion of the voir dire examination.

Citing *Fahy v. Connecticut,* 375 U. S. 85, 84 S. Ct. 229, 11 L. Ed.2d 171 (1963), defendant contends, and correctly so, that if the knife taken from the trunk of his car was the product of an illegal search, its admission into evidence constituted prejudicial error, notwithstanding the legality of whatever other evidence the state made available to the jury and on which they might have reached their verdict. Starting with this basic premise, defendant proceeds to argue that both the search of his car and seizure of the knife without benefit of a warrant were in violation of the prohibition contained in art. I, sec. 6, of the constitution of this state and art. IV of amendments to the federal constitution, and made binding on us by art. XIV of amendments to the federal constitution.

Specifically, he maintains: that conceding the facts to have been established as contended for by the state, the search was not incidental to the arrest, relying on *Preston v. United States,* 376 U. S. 364, 84 S. Ct. 881, 11 L. Ed. 777 (1964); that the police lacked sufficient probable cause to

support the obtaining of a search warrant; and that defendant's alleged consent was obtained under conditions such as to render it involuntary as a matter of law, or, in the alternative, that he was not timely and properly advised that he need not comply with the police request to search the car.

In keeping with sound police investigation under the circumstances as they were then known to the police, the defendant's car was towed to the police station—and this prior to defendant's arrest, which occurred almost simultaneously with the arrival of the car at the police garage which is in the basement of the station where defendant was being questioned. Whether these circumstances are so dissimilar to those in *Preston, supra,* as to take the instant case out of the rule laid down in *Preston,* we do not inquire. In the ultimate view we take of the consent question, it suffices to assume without deciding that they are not.

We cannot agree, however, that there was insufficient probable cause for obtaining a search warrant, but since no warrant was obtained, this question is academic and we turn our attention to defendant's remaining contentions.

The argument that, contrary to the state's contentions, defendant's alleged consent was not voluntary, is alternatively postured. The defendant argues that either the tossing of the keys to Lieutenant Andrukiewicz with knowledge that they would be used to search the car was acquiescence under conditions amounting to duress, hence not voluntary, or that his acquiescence was involuntarily obtained for the reason that when asked for the keys to search the car, defendant was concededly not advised of his right to refuse.

We reject as totally lacking in merit all argument that defendant's turning over the keys and consenting to the search of the car resulted from actual duress. In the voir dire examination, which by defendant's election was substituted for a hearing on a motion to suppress, the testimony of all police officers involved in the questioning of

defendant was that no force or threat of force was used at any time. In his testimony defendant did not so much as suggest anything to the contrary. While his wife in her testimony during the voir dire insinuated that from the rudeness with which she was treated an inference might be drawn that defendant was a victim of intimidation, she stopped short of testifying to any that she observed.

Later, during defendant's case in chief, she was somewhat more positive. Testifying as to one point in the second conversation that she had with her husband, she stated, " 'Don't let them beat you again * * *.' " Her husband, however, offered no such testimony and we think that the trial justice's implicit rejection of her testimony is supported by the record.

The argument that, under the conditions prevailing at the police station, defendant's acquiescence to the search was submission to authority rather than consent, is more troublesome. We are unrestrainedly in accord with the proposition that an accused's consent to a search is a waiver of the protection guaranteed to him by the constitutions of this state and the United States. Such waiver is never to be presumed. It must be clearly shown to have been freely and knowingly given, uninduced by not only actual but implied duress. *Judd* v. *United States,* 190 F. 2d 649 (1951); *Channel* v. *United States,* 285 F. 2d 217 (1960).

Where, as here, the asserted consent is obtained from one under arrest, custodially secured in a police station with its attendant ambient of officialdom, there is present a situation which suggests the probability that the acquiescence was submission to authority rather than an intelligent waiver. See *Judd, supra.*

Even so, it has never been held that a finding of consent, freely and intelligently given, is precluded as a matter of law when obtained from one under arrest and officially secured. That valid consent was obtained under such circumstances is still a question of fact to be determined by

the trial justice in the first instance, although the burden on the state is to establish such consent by clear and convincing evidence. *United States* v. *Page,* 302 F.2d 81 (1962). There, in a discursive review of apposite decisions, the court held that in passing on the decision of the trial justice on a motion to suppress, the duty of the reviewing court is to view the evidence in the light most favorable to the government and apply the "clearly erroneous" rule.

In that decision, at page 85, the learned justice· adopted the definition of that rule as laid down in *United States* v. *United States Gypsum Co.,* 333 U. S. 364, 68 S. Ct. 525, 92 L. Ed. 746 (1948), as follows:

> " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' "

Our research of cases in point decided since *Page, supra,* fails to disclose that the United States supreme court or the circuit courts of appeal have altered the holding in *Page.* In *State* v. *Sneed,* 76 N. M. 349, 414 P. 2d 858 (1966), the court, adhering to the principles reviewed in *Page,* and citing decisions of the United States supreme court, stated at page 351, 414 P. 2d, at page 860, "The question of whether consent has been given is a question of fact subject to the limitations of judicial review."

Continuing, the court, after having observed that application of the rule results in some apparently· conflicting decisions, stated, "Each case must stand or fall on its own special facts, and in the trial court's judgment of the credibility of the witnesses." See also *United States* v. *Kuntz,* 265 F. Supp. 543 (1967); *State* v. *Gates,* Iowa, 150 N. W. 2d 617 (1967); *State* v. *Little,* 270 N. C. 234, 154 S. E. 2d 61 (1967).

In the case at bar a voir dire examination was held in lieu of a prior hearing on a·motion to suppress and this procedure was at the election of defendant. We have here-

tofore stated the evidence before the trial justice at some length. From our review thereof we cannot say that the decision of the trial justice as to defendant's voluntary consent to the search of his car and the seizure of the knife was predicated on evidence so lacking in conviction as to persuade us that a mistake was made.

Moreover, in his charge to the jury, the trial justice instructed them that the admission of the knife into evidence had been proper only if they found that it was the product of a search to which defendant had freely and knowingly consented. Calling their attention to the fact that the evidence before them on this issue was in sharp conflict and the burden was on the state to satisfy them that defendant had in fact consented, he instructed them that if they found that defendant had not consented, nor been advised of his fifth and sixth amendment rights, they were to reject from their consideration all statments attributed to defendant as well as the knife, since all such evidence would have been obtained in violation of defendant's constitutionally mandated protection. From our examination of the evidence on which he relied and his concept of defendant's rights as disclosed by his instructions to the jury, we hold that his decision on the voir dire examination was not error.

Nevertheless, defendant further contends that, assuming the validity of the trial justice's preliminary decision, defendant's consent to the search was involuntary as a matter of law. He predicates this contention on the proposition that even though he had been seasonably and properly advised of his fifth and sixth amendment rights prior to any accusatory questioning, the fourth amendment protection against unreasonable searches and seizures requires that he should have been advised of his right to refuse Lieutenant Andrukiewicz's request for the keys and permission to search the car. This advice, defendant urges, should have been given at the time the request was made. It is to be noted that the lieutenant testified no such advice was given.

In effect, it is defendant's position that the rule enunciated in *Miranda* v. *Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and *State* v. *Mendes*, 99 R. I. 606, 210 A.2d 50 (1965), should be extended so as to constitute a condition precedent to a voluntary consent to search notwithstanding the fact that an accused in custody had been given and understood the rights mandated by the cited cases at the threshold of the accusatory interrogation. We note parenthetically that the case at bar was tried prior to the *Miranda* and *Mendes* decisions, hence they are not applicable here. It was tried subsequent to *Escobedo* v. *Illinois*, 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964), however, and out of an abundance of regard for the instant defendant's rights, we relate his immediate contention to the safeguards enunciated in *Escobedo*.

The United States court of appeals for the first circuit considered and rejected an argument for an extension of the *Miranda* rule, such as defendant here makes, in *Gorman* v. *United States*, 380 F. 2d 158, decided June 29, 1967. In that case at page 164, the circuit court stated:

> "We cannot accept the recently suggested rule that a specific warning of fourth amendment rights is necessary to validate a warrantless search after the suspect has been arrested. * * * Although the analogy with Miranda * * * has a surface plausibility, we do not think that the Miranda prescription, formulated to give threshold warnings of fifth and sixth amendment rights at the earliest critical time in a criminal proceeding, must or ought to be mechanistically duplicated when circumstances indicate the advisability of requesting a search. In the first place, advocacy of an automatic second-warning system misunderstands and downgrades the warnings required by *Miranda*. Their purpose was not to add a perfunctory ritual to police procedures but to be a set of procedural safeguards 'to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it.' 384 U. S. at 444 * * *. These constitute 'an absolute pre-

requisite in overcoming the inherent pressures of the interrogation atmosphere.' Id. at 468 * * *. The obligation of the interrogators is not discharged by the adequate and effective appraisal of the accused's rights. 'If * * * he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.' Id. at 444-445 * * *. While the police interrogators must faithfully carry out *Miranda's* mandate at the threshold, they may then proceed to elicit responses, however incriminating, without further specific warning. To single out for further warning a request to search premises of an accused is to assume that a different order of risks has not been covered at the threshold. But that things which might be found in a search could be used against an accused seems implicit in the warning of the right to remain silent which, as the Court observed, is calculated to make him 'more acutely aware * * * that he is not in the presence of persons acting solely in his interest.' 384 U. S. at 469 * * *."

Having heretofore determined that the trial justice's decision on the motion to suppress, heard as a voir dire examination, is not clearly erroneous, and that the jury, notwithstanding the trial justice's decision as to the admissibility of the challenged evidence, was properly instructed that in the last analysis the question of whether such evidence had been lawfully obtained was for them, we hold that the defendant's exception is without merit.

The defendant's exception is overruled, and the case is remitted to the superior court for further proceedings.

*Herbert F. DeSimone,* Attorney General, *Richard J. Israel,* Assistant Attorney General, for plaintiff.

*F. Lee Bailey, Ira L. Schreiber, Raul Lovett,* for defendant.