## STATE

v.

### Raymond BEAUMIER.

No. 83–507–C.A.

Supreme Court of Rhode Island.

Aug. 1, 1984.

Dennis J. Roberts, II, Atty. Gen., Thomas Dickinson, Sp. Asst. Atty. Gen., Providence, for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, Chief of Appellate Div., Providence, for defendants.

## OPINION

KELLEHER, Justice.

This is an appeal from a Superior Court judgment of conviction in which the defendant, Raymond Beaumier (Beaumier or defendant), was found guilty by a jury of (1) committing an assault with intent to kill and (2) assault with an intent to rob. Beaumier raises four issues in this appeal. In answering them, we shall, among other factors, consider a defendant's constitutional confrontation right and the exceptions-to-the-warrant requirement of the Fourth Amendment to the Constitution.

The incident that is the subject of Beaumier's conviction occurred on August 6, 1980, on Main Street in East Greenwich. On that day Robert Bennett, the owner of Bob's Coins and Collectibles, was waiting on a customer who was seeking to add to her stamp collection.

A masked man entered Bennett's store and, brandishing a firearm, demanded that Bennett turn over his money. Bennett, exercising what he considered his own Second Amendment right, quickly aimed a weapon at the intruder. In a shoot-out that followed, Bennett was wounded in the arm. Of the three shots Bennett fired, one he was positive struck the intruder.

As the masked man hurriedly left the shop, the proprietor of the establishment adjacent to Bob's Coins noticed that the getaway car was a large, tan, two-tone automobile. The license plate had been folded in half, its identification numbers obscured.

Later that evening, Sergeant Ronald Lewis of the Providence police department returned home from his patrol shift at approximately 9 p.m. His wife had left him a message instructing him to "call Ray." A phone number accompanied this request.

Initially, Lewis did not know who "Ray" was. However, he dialed the number and soon recognized the voice of Beaumier on the phone.[1] Beaumier apparently told Lewis that he had "held up a place," that he had been shot, and that he had shot the clerk in the store. Lewis further testified that Beaumier told him the store was "an antique or gold store" and that it was located in East Greenwich.

Beamuier's reasons for making the call are not at all clear. Apparently, he wanted Lewis's advice about what course of action he should take. Lewis, true to his badge, told Beaumier to give himself up and immediately seek medical attention. This was not the counsel Beaumier desired; he told Lewis that a person was coming to Beaumier's home "to take the bullets out."

This phone call terminated, Lewis immediately took steps to verify Beaumier's story. The East Greenwich police told Lewis of the incident at Bob's Coins and of their information that the attacker was wounded. Lewis then called Beaumier again. This conversation was much shorter than

---

1. Lewis testified that he had known Beaumier for over a year. Apparently, Beaumier had performed repairs on Lewis's car. There is also evidence that Lewis had dated Beaumier's sister-in-law.

the first. Beamuier merely stated that he was "not feeling too well" and that he had to end the conversation since the arrival of the would-be surgeon was imminent.

Lewis then organized an official police response to the situation. The response consisted of representatives from three police departments: Providence, of which Lewis was a member; Cranston, the location of the Beaumier residence; and East Greenwich, the location of the shoot-out.

It was approximately midnight when the group finally prepared to gain entrance to Beamuier's home. Lewis, who was familiar to both defendant and his wife, approached the back door and knocked. Mrs. Beaumier opened the door for his admission. As soon as she did so, other police officers soon followed Lewis into the house. Mrs. Beaumier protested their entrance, yelling, "You can't come in here," but her protests went unheeded.

Almost as soon as Lewis entered the kitchen (the room adjacent to the back door), he testified that he heard "noises coming from downstairs in the basement." He went to the basement stairway, saw Beaumier, and directed him to the kitchen. Beaumier, whom Lewis described as wounded in the neck and shoulder, was then taken into custody.[2]

At this point, the remaining contingent of officers burst in. Several of them descended into the basement, where a group of the Beaumiers' friends were seated. They were frisked and also escorted from the house. One of the officers testified that he observed a "steaming pan of water," medical supplies, and a bloody towel.

Soon thereafter, at approximately 1 a.m., Mrs. Beaumier signed a consent-to-search form allowing the officers to search the basement area. She also permitted a search of the Beaumiers' car, which matched the description of the getaway car. The search of the automobile revealed no incriminating evidence, and the fruit of the basement search was a box of .32-caliber bullets.

Before addressing the significant constitutional questions raised at trial, we must first consider the propriety of the trial justice's denial of Beaumier's Super.R.Crim.P. 48(b) motion to dismiss. This court has recently stated that this question is addressed to the sound discretion of the trial justice. *State v. Dionne*, R.I., 474 A.2d 445, 449 (1984).

 The defendant bears the initial burden of showing that none of the delay was attributable to him. *Id.* 474 A.2d at 447. If the trial justice is not satisfied that the defendant was not responsible for the delay, this court will not disturb the trial justice's decision. *State v. Austin*, R.I., 462 A.2d 359, 364 (1983).

 In this case, the trial justice concluded that at all times the state was ready for trial. However, as Beaumier's counsel was engaged in another matter from May 1981 until July of 1981, he asked that the court remove the case from the trial calendar. Furthermore, Beaumier twice failed to appear when the case was called for trial—in July and September of 1981. Since defendant failed to carry the initial burden, we will not overturn the trial justice's decision. *State v. Austin*, 462 A.2d at 364.

 The next issue raised by Beaumier relates to the details of the shoot-out. At trial Bennett testified that five shots were fired in the store. At the time the trial started, Beaumier was under the impression that all but one had been found. This information was given to defense counsel pursuant to Rule 16. During the trial, defense counsel learned that the fifth bullet had been discovered. This bullet was imbedded in the door frame of Bob's Coins; only a picture of it existed. Beaumier

---

**2.** After Beaumier was in custody and out of the house, an ambulance was called, and he was taken to the hospital.

moved for a mistrial, claiming that this photograph should have been provided him.

On appeal Beaumier admits that the photograph of the bullet (which was lodged in the wall and could not be removed) would not have been covered by a discovery request. Rather, Beaumier argues here that the "surprise at trial" from the disclosure should result in a new trial.

The state never sought to introduce, and did not introduce, the photograph of the doorframe with the bullet. Furthermore, as Beaumier concedes, the state provided all materials requested. Nevertheless, Beaumier claims that a "sleeping volcano" exists, and the sudden discovery of the bullet altered his trial tactics since he was proceeding under a faulty assumption.

However, this problem can in no way be charged to the state. The state did provide the Bob's Coins address in its discovery materials. If defendant had gone to Bob's Coins and Collectibles, the bullet in the wall would have been revealed to him. This failure by defendant to use the provided discovery for investigatory purposes should not lead to a dismissal of the case.[3]

■ The question of the shoot-out is also the subject of another facet of defendant's appeal. In his statement given to the police on the day of the robbery, Bennett said, "I turned towards him and pointed my gun right at him and hesitated as I still thought he was kidding. At that point I heard a shot. It didn't hit me. I had my gun still pointed at him and I proceeded to crank two rounds at him. I know he returned fire at me. I think it was two more shots. At this point I was retreating for the back room and I felt a sting to my right arm. I got into the back room and I heard I think two more shots."

At trial Bennett testified that five shots were fired. The defendant desired to intro-

duce this statement, alleging that it indicates that Bennett originally stated that there had been seven shots. The court did not allow the statement to be admitted for impeachment purposes. Pursuant to *State v. Earley*, 118 R.I. 205, 373 A.2d 162 (1977), the trial justice concluded that the statement was not inconsistent with the testimony. In reaching this conclusion, the trial justice clearly felt that the second mention of two shots was merely a recapitulation of the two initially mentioned.

This court has held that in order for a statement to be admitted for impeachment purposes, it must be truly inconsistent. *State v. Wallace*, R.I., 428 A.2d 1070, 1073 (1981). "[T]he inclusion and exclusion of proposed questions on the ground of relevance or materiality is a matter within the sound discretion of the trial justice and may be reviewed only for an abuse thereof." *Id.* In reviewing the trial justice's decision, we find that there has been no abuse of discretion in finding the statement not materially inconsistent for impeachment purposes.

We now turn to the final two issues. They present significant and difficult questions of law. In answering them, we are now testing the very limits of a defendant's Sixth Amendment right of cross-examination and the exceptions-to-the-warrant requirement.

■ Sergeant Lewis clearly was the state's most important witness. He established the link between the attempted robbery and defendant by testifying to the allegedly incriminating phone call from Beaumier. Beaumier sought to introduce evidence that at the time of the incident Lewis was under investigation as part of an inquiry into a theft from a Providence lumber yard.[4] It was defendant's theory

---

**3.** This decision is strictly circumscribed by circumstances where, as here, no discovery obligation was neglected, *State v. Verlaque*, R.I., 465 A.2d 207 (1983), where the defendant never investigated the information received and where the defendant never asked for a continuance.

*State v. Coelho*, R.I., 454 A.2d 241 (1982). There is also no violation of the *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), doctrine.

**4.** No charges were ever brought against Lewis as the result of the investigation.

that Lewis may have fabricated his story in order to ingratiate himself with his superiors in the Providence police department.

This court has repeatedly stressed the vital importance that both the United States and the Rhode Island Constitutions attach to a defendant's confrontation rights. Time and again, *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), has been favorably cited for its declaration that the right of cross-examination is a primary interest secured by the confrontation clause, it being the principal means by which to test the truth and veracity of a witness's testimony. *See, e.g., State v. Freeman,* R.I., 473 A.2d 1149 (1984); *State v. DeBarros,* R.I., 441 A.2d 549 (1982); *State v. Anthony,* R.I., 422 A.2d 921 (1980).

We have been especially solicitous of cross-examination for bias or motive on the part of a defendant's primary accuser. For example, in *State v. Freeman,* R.I., 473 A.2d 1149 (1984), we held that it was error to refuse to allow inquiry into the status of the state's prime witness as a murder suspect at the time she gave a statement to the police. *Id.* 473 A.2d at 1154. Likewise, in *State v. Parillo,* 480 A.2d 1349, (R.I. 1984), we held that it was improper to refuse inquiry into a witness's potential motive of seeking favorable police treatment for her husband in return for testimony.

These cases both place heavy reliance on *State v. DeBarros,* R.I., 441 A.2d 549 (1982). In *DeBarros,* the trial justice refused to allow the jury to hear testimony that the victim of the assault for which the defendant was convicted was going to sue the State of Rhode Island. This clearly was reflective of the witness's motive and was a proper subject of inquiry. The confrontation right "may not be given or withheld at the discretion of the trial justice." *Id.* 441 A.2d at 552.

Here Beaumier desired to make the jury aware that Lewis was a suspect in alleged thefts from a Providence lumber yard. The Providence police had conducted an internal investigation into the allegation, but no wrongdoing was uncovered. This investigation had terminated prior to August 1980. However, the State Police were involved in their own investigation on August 6 and 7, 1980. Beaumier in cross-examination, therefore, desired to show that Lewis had a motive to fabricate the phone call from Beaumier in order to ingratiate himself with his superiors.

This line of inquiry was rejected by the trial justice on the basis that Lewis's "brownie points" theory did not add up because it was the State Police, rather than the Providence police, who were investigating him in August 1980. The trial justice observed, "[I]t seems to me that the issue of his motive to lie becomes so thin, so attenuated at that point, that it would not help the jury in its search for the truth."

Although at the time of trial both investigations were a distant memory and no official charge of misconduct was ever leveled against Lewis, those objective factors are not determinative of the admissibility of the evidence. The right of confrontation is concerned with the proposition that a jury be allowed to evaluate any motive that a witness may have for testifying. That right is especially precious where, as here, the motive may belong to the state's prime witness.

It is clear, therefore, that the evidence concerning the investigation should have been admitted. The state, of course, would have both ample ability and ammunition to rebut the alleged motive Lewis may have had to ingratiate himself with his superiors. However, in the final analysis, it is the jury that should consider the evidence and reach its own conclusion.

This argument brings us to the search-and-seizure issues. Two searches occurred on August 6 and in the early-morning hours of August 7; neither had the benefit of a search warrant. The state argues that the first search, conducted pursuant to the emergency doctrine, was a proper application of that principle. The second search

was conducted after defendant's wife signed a consent form.[5]

After Lewis received the phone call and gathered representatives of the Providence, Cranston, and East Greenwich police departments, he proceeded to Beaumier's Cranston home. Lewis testified that he was concerned for Beaumier's safety, having been told that he had been shot twice and "was not feeling too well." Lewis's concern was exacerbated by the prospect of an impending illegal surgical operation under marginally sanitary conditions.

Lewis then went to a back door and knocked. Mrs. Beaumier saw Lewis and opened the door to allow him in. However, when she saw the other officers waiting in the wings, she violently protested their entrance and presence in her home.

Simultaneously with Lewis's sudden appearance, Beaumier appeared near the kitchen, apparently behind a door that led to a staircase to the basement. Beaumier was immediately frisked and taken to a police cruiser. An ambulance was then called to transport Beaumier to the hospital.

After Beaumier was taken from the house, two officers then proceeded to the basement. A group of people were in the basement, and an officer testified that he saw a pan of "steaming water" in which there were several "probing-type instruments." They also saw gauze and a bloody towel. Statements reflecting these observations were admitted at trial. The officers remained in the basement while each of the guests were removed from the house. The defendant sought to have all observations and statements made pursuant to the entry suppressed.

■ It is by this time clear that searches and seizures should be conducted only pursuant to valid warrants issued by a neutral and detached magistrate. *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191,

93 L.Ed. 153 (1948). The exceptions to that rule are narrowly defined and jealously guarded. Two exceptions are pursuant to the emergency doctrine, *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), and consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

This court has recently discussed the emergency doctrine, referring only to the Fourth Amendment and not our own art. I, sec. 6. The rationale behind the doctrine "is that the existence of an exigency or some other mitigating circumstance permits a police officer, rather than a judicial officer, to make a dispositive issue of probable cause * * *." *State v. Benoit*, R.I., 417 A.2d 895, 900 (1980), cited in *Duquette v. Godbout*, R.I., 471 A.2d 1359, 1362 (1984). "The emergency doctrine requires that the responding officer have a reasonable belief that his assistance is required to avert a crisis." *Id.* We also stated in *Duquette* that "the motivation for the intrusion is to preserve life and property rather than to search for evidence to be used in a criminal investigation." *Id.*

■ This final passage is exactly what the state relies on to support the officer's conduct—concern for defendant's health. The trial justice rejected this view. "The claim of urgency is not substantiated by the sheer amount of time it took everyone to get geared up from this situation from nine-o'clock in the evening to midnight." Although not determinative of whether an emergency existed, the lapse-of-time inquiry is relevant as to whether there is a legitimate need for the performance of the search. *Mincey v. Arizona*, 437 U.S. at 393–94, 98 S.Ct. at 2414, 57 L.Ed.2d at 301.

There is still another reason for rejecting the application of the emergency doctrine in this case. Beaumier was arrested almost exactly as the police entered the home. Once arrested and taken from the house, any emergency dissipated. Once

---

5. The defendant's motion to suppress raised only questions under the United States Constitution. Therefore, we shall not consider the pro-

priety of the search under art. I, sec. 6. *State v. Benoit*, R.I., 417 A.2d 895, 898 (1980).

the reason for an entry without a warrant disappears, the officers no longer have any right to be on the premises. Without a patient, there could be no operation. Furthermore, Beaumier's health was soon to be cared for. A warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889, 908 (1968). Therefore, the trial justice was correct in stating that if the search had ended here, the evidence would have had to have been suppressed. This is not a situation in which law officers are responding to a cry for help. This was a planned response to knowledge of a criminal situation.

Although the trial justice stated that "if this is when the facts of this case had ended, then I would have to say that the evidence should be suppressed," officers, nevertheless, were allowed to testify that Mrs. Beaumier had vociferously attempted to exclude them from her home and that they had observed a steaming pan of water, a bloody towel, and "mounds of gauze." All of this testimony should have been excluded since it was pursuant to the illegal entry. "The exclusionary prohibition extends as well to the indirect as the direct products of [illegal] invasions." *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453 (1963).

Later that evening Mrs. Beaumier signed a "consent to search" form. With that consent executed, the officers conducted a painstaking search—particularly for a bullet that may have been taken from Beaumier's body. The subsequent search disclosed only a box of bullets.

■■■■ There is no question but that a search conducted pursuant to a valid consent is constitutionally permissible. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). But the question remains, exactly what must the state do to show that consent was voluntary? The state must prove that consent to a search is freely and voluntarily given.

Whether a consent is valid under the circumstances is a question of fact to be determined by the trial justice in the first instance. *State v. Leavitt,* 103 R.I. 273, 290, 237 A.2d 309, 319, *cert. denied,* 393 U.S. 881, 89 S.Ct. 185, 21 L.Ed.2d 155 (1968). The Supreme Court has not yet enunciated any clear rules about those circumstances that establish voluntary consent, although a number of cases do lend general guidance.

■■■ *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), first dealt with the consent-to-search question. That court held that the burden of proof "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Id.* at 548–49, 88 S.Ct. at 1792, 20 L.Ed.2d at 802. Other cases have established various barometers to determine whether the consent was truly voluntary. These include the number of police officers entering the home, *United States v. Mayes,* 552 F.2d 729 (6th Cir. 1977); the apprehension of a family member, *Lowery v. State,* 499 S.W.2d 160 (Tex. Crim.App.1973); the time of day, *United States v. Mapp,* 476 F.2d 67 (2d Cir.1973); and an outlandish display of weaponry, *Lowery v. State, supra.*

Various courts have taken further guidance from *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), for standards relating to voluntariness of a confession to be used in the context of a search. *Schneckloth v. Bustamonte* held that a confession must be the product of an essentially free and unconstrained choice by its maker. *Id.* at 225, 93 S.Ct. at 2047, 36 L.Ed.2d at 862. The Court employs a "totality of circumstances" approach in determining whether the will has been overborne. No single criterion is the determinative factor in reaching a conclusion about whether a will is overborne—it is a question of fact. *Id.* at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 863. However, in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the

absence of a show of force was significant in upholding consent.

In finding that the consent form was validly executed, the trial justice concluded that at the time Mrs. Beaumier signed the form, the coercive atmosphere that may have existed when the police initially entered the Beaumier home had dissipated. The trial justice ruled that Mrs. Beaumier was calm and was thinking "logically and in sequence" and that, in examining the totality of the circumstances, "the court has to conclude that this consent was voluntary."

The trial justice passed upon each of the various barometers indicative of coercive police behavior in reaching this conclusion. She did not credit the testimony that there was an enormous display of weaponry by the police. The justice noted that Mrs. Beaumier was encouraged to call her father and that she was completely free to move throughout the house. She also noted that Mrs. Beaumier was calmly speaking to the officers when she filled out the form.

The court placed great value on the fact that the consent was signed over an hour after the initial entry and that the situation was no longer volatile. The officers had also advised Mrs. Beaumier of her rights prior to the execution of the form.[6] In view of these circumstances, the court concluded that Mrs. Beaumier's consent was voluntary.

In passing on a decision of a trial justice on a motion to suppress, the duty of the reviewing court is to view the evidence in the light most favorable to the government and apply the "clearly erroneous" rule. *State v. Jenison*, R.I., 442 A.2d 866 (1982); *State v. Leavitt*, 103 R.I. at 290, 237 A.2d at 318. Since a trial justice's determination of voluntariness is factual and the findings of fact on this issue include an assessment of credibility, we shall disturb the trial justice's ruling only if it was clearly erroneous. *State v. Riendeau*, R.I., 448 A.2d 735, 737 (1982). In the instant case, the trial court ably weighed all of the evidence and concluded that the totality of circumstances indicated that the consent was voluntary and not the result of an overborne will. Therefore, evidence gathered after the consent was signed is properly admitted.

In conclusion, we rule that the state may not use the evidence found pursuant to the warrantless search and prior to the execution of the consent form. Therefore, the statements made to the police and the observations made by them are not admissible. *See United States v. Segura*, 663 F.2d 411, 417 (2d Cir.1981), *affirmed on other grounds*, —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

For the foregoing reasons, the defendant's appeal is sustained, the conviction appealed from is vacated, and the case is remanded to the Superior Court for a new trial.

BEVILACQUA, C.J., did not participate.

---

**6.** This consent in no way ratifies the prior improper warrantless entry. Mrs. Beaumier allowed only a search after the time of consent.