DECISION
The State of Rhode Island has charged the defendants, Melodina Cedano ("Cedano") and Ramon Melendez ("Melendez"), with possession of over five kilograms of marijuana in violation of R.I.G.L. §§ 21-28-4.01.2 (A)(5) and 21-28-4.01.2 (B). Melendez is further charged with violating R.I.G.L. § 11-47-3.1 for carrying or having available a stolen firearm while committing a crime of violence, to wit: possessing over five kilograms of marijuana. In response, defendant Cedano has filed the instant motion to suppress.
 Facts/Travel
On December 13, 1998, shortly after 2:00 A.M., the owner/landlord of 278-280 Montgomery Street in Cranston, Rhode Island telephoned the Cranston Police Department to report a domestic disturbance at his tenant's second-floor apartment, 280 Montgomery Avenue. Patrolman Antonucci, Patrolman Camevale, and Sergeant McGrath, responding to the call, all arrived at approximately the same time. When the officers arrived, the landlord informed them that his tenant, Cedano, had run from the building crying hysterically and that Cedano's boyfriend, Melendez, had run outside after her. The landlord further indicated that he intentionally had sent Melendez in the opposite direction that Cedano had taken, for fear of Cedano's safety.
Antonucci went East on Montgomery to look for Cedano. Carnevale went the opposite way to search for Melendez. Camevale located Melendez and brought him back to the property. Melendez was kept in the back of the police cruiser, along with what appears to have been a civilian "ride-along," who remained in the front seat. Antonucci was informed that Carnevale was bringing Melendez back to the property, so he returned as well.
Thereafter, Antonucci, Carnevale, and Patrolman Saucier walked up the stairs to the landing in front of Cedano's second-floor apartment. Antonucci testified that the apartment door was partially ajar. From outside the apartment, the officers detected a strong smell of unburnt marijuana. While the officers were standing outside Cedano's apartment, McGrath radioed that he had located Cedano and that he was bringing her back to the apartment. When McGrath found Cedano, she was hiding in some bushes at a neighbor's house and appeared visibly upset and cold. She was wearing only a T-shirt and shorts on the cold, December night.
McGrath escorted Cedano to her apartment to continue the investigation into the possible domestic assault. McGrath and the other officers all testified at the suppression hearing that Cedano was not handcuffed prior to her arrival at her apartment. Upon their arrival, McGrath inquired of Cedano as to whether anyone else was inside. McGrath ascertained, from his conversation with Cedano, in English, that Cedano had two children who were staying with Melendez's mother for the night, but that Cedano did not know if anyone else was present in her apartment. At that point, Cedano and the four officers first entered the apartment. For precautionary reasons, while Cedano and McGrath remained in the living room, Antonucci, Carnevale, and Saucier walked through the rest of the apartment to secure the premises and to ascertain whether or not anyone else was present. In the course of the officers' protective sweep, they saw a plastic bag, in an open cabinet in the kitchen, that contained a substance which the officers immediately recognized as marijuana. The plastic bag was in "plain view."
The officers' findings were reported to McGrath. McGrath asked Cedano whether there were drugs present in the apartment, to which she replied in the negative. Thereafter, Cedano complied with the officers' request to sign a Consent to Search form ("consent form"). Carnevale testified that he filled out the consent form, which was written in English, in front of Cedano. Carnevale read it to her and inquired as to whether Cedano understood her rights. McGrath and Carnevale testified that Cedano appeared to have no problems understanding the form and asked no questions.
Subsequent to Cedano's signing the consent form, a search of the apartment ensued. Photographs of the premises were taken, including the kitchen area where the marijuana was viewed. During the search, Cedano and Melendez were arrested and transported to the Cranston police station. While the aforementioned officers continued their search, members of the Cranston Police Special Services Division were contacted. Sergeant Gordon Smith ("Smith") eventually arrived at the police station. Smith spoke with both Cedano and Melendez. Smith gave Cedano her Miranda Rights form, written in Spanish, which she signed. Smith then had Cedano sign a second Consent to Search form, which also was written in English. Before Cedano signed the second consent form, Smith read it to Cedano and had Cedano read it to him. Smith testified that Cedano had no difficulty reading the consent form and asked no questions. After the second consent form was signed, Smith proceeded to Cedano's apartment to assist with the search.
The officers seized a .38 caliber handgun, bullets, a holster, two electronic scales, various bagging materials, a pager, $1,648.00 in US currency, and nineteen bags of marijuana, weighing approximately 18.6 pounds. Cedano and Melendez were charged with possession of over five kilograms of marijuana in violation of R.I.G.L. §§ 21-28-4.01.2 (A)(5) and 21-28-4.01.2
(B). Melendez was further charged with violating R.I.G.L. §11-47-3.1 for carrying or having available a stolen firearm while committing a crime of violence, to wit: possessing over five kilograms of marijuana.
Cedano filed a motion to suppress claiming that the search of her apartment was invalid because no warrant issued and no exception to the warrant requirement exists. She maintains that the consent form is invalid because she did not sign it "freely and voluntarily," but rather, in response to intimidation and coercion. Additionally, Cedano alleges that she did not understand the ramifications of granting consent because she does not speak very much English. The matter was heard on May 28, 1999 and June 22, 1999. At the suppression hearing, the hearing justice requested that the parties submit memoranda including suggested findings of fact and conclusions of law.
[A] warrantless search of premises that police officers have lawfully entered is limited to a brief sweep to ascertain whether additional victims or suspects are still on the premises." Statev. Hockenhull, 525 A.2d 926, 932 (RI. 1987). In the instant case, the police officers were responding to an alleged domestic violence situation. The officers' investigation appropriately continued once McGrath located Cedano hiding in a neighbor's bushes, visibly upset, dressed only in a T-shirt and shorts in the middle of the winter. Neither Cedano, nor the officers, knew whether anyone else was present in the apartment when they arrived upstairs, as the front door was unlocked the entire time Cedano and Melendez were out of the apartment. Any reasonable police officer would have secured the area before allowing Cedano to reenter. After performing the limited cursory search, the officers stopped and obtained a valid consent to search. State v.Alexander, 433 A.2d 965 (RI. 1981).
The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." State v. Jennings,461 A.2d 361, 365 (RI. 1983) (citing Mincey v. Arizona,437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290, 298-99 (1978)). "Governmental `searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'"Duquette v. Godbout, 471 A.2d 1359, 1362 (R.I. 1984) (citing Katzv. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967) (citations omitted)). A search conducted pursuant to a valid consent is a constitutionally permissible exception. State v. Beaumier, 480 A.2d 1367, 1374 (citing UnitedStates v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)). It is the state's burden, however, to prove by a preponderance of the evidence, that the purported consent to search was freely and voluntarily given. State v. Martinez,624 A.2d 291, 296 (R.I. 1993) (citing Beaumier, 480 A.2d at 1374)). "Whether a consent is valid under the circumstances is a question of fact to be determined by the trial justice in the first instance," Id. (citing State v. Leavitt, 103 R.I. 273, 290,237 A.2d 309, 319, cert. denied, 393 U.S. 881, 89 S.Ct. 185, 21 L.Ed.2d 155 (1968)), based upon "the totality of the circumstances." Beaumier, 480 A.2d at 1374-75.
In State v. Garcia, the defendant was convicted of felony-murder after two men died in a fire that the defendant intentionally had set. After his conviction, the defendant challenged the voluntariness of his statement to the police and the waiver of his Miranda rights. The defendant relied heavily upon the fact that he was not supplied with a Spanish interpreter prior to the police's interrogation of him. The defendant argued that his Cuban-based, fourth-grade education and his limited knowledge of English rendered the waiver of his Miranda rights invalid.
After applying the "totality of the circumstances" test, the court found that the defendant's Miranda waiver was voluntary. The defendant had contradicted the signed waiver form and police testimony and maintained that he was never informed of his constitutional rights. He explained that when he signed the waiver, he could not read or write English and only signed the waiver because he was asked to do so by the police. State v.Garcia, 643 A.2d 180, 189 (R.I. 1994)). The defendant also testified that he did not understand English very well and did not understand most of his conversations with the police or the assistant attorney general. Id.
At the suppression hearing, however, the trial justice found that the defendant was sufficiently fluent in conversational English. Although born and schooled in Cuba, the defendant had been in the United States for ten years. The defendant's girlfriend, with whom he had been living for three weeks, spoke English and had only limited knowledge of Spanish. Id. The Garcia
court also gave weight to the defendant's express, written waiver and to the fact that, at no time during his interrogation, did the defendant seek the assistance of an interpreter or tell the assistant attorney general that he did not understand what was being said. Id. at 189-90. The Garcia court held "statements by defendants `are essential to society's compelling interest in finding, convicting, and punishing those who violate the law."'Id. at 190 (citing State v. Leuthavone, 640 A.2d 515, 520 (R.I. 1994) (quoting Moran v. Burbine, 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410, 424 (1986)). "[T]hat interest would be circumvented were we to permit defendant and others similarly situated, despite being sufficiently fluent in the English language, to hide behind their native languages to `avoid the ramifications of self-incrimination during custodial interrogation."' Garcia, 643 A.2d at 190 (citing Leuthavone, 640 A.2d at 520).
The facts in the instant case are strikingly similar to those in Garcia. Here, Cedano argues that she did not understand the ramifications of signing the consent forms because she does not understand English. She argues that the only reason she signed the first consent form at the scene was that she was nervous and frightened of being handcuffed and not knowing why. She claims that she signed the second consent form at the police station because the officers threatened to take away her children. As such, Cedano maintains that her consent to have her apartment searched was "involuntary." This Court finds otherwise.
Five sequestered police officers testified at the suppression hearing. It is undisputed that all conversations between Cedano and the officers were in English. From those conversations, in English, the police were able to ascertain that Cedano was Catholic and was from the Dominican Republic. They were also able to determine Cedano's social security number, as well as the fact that she had two sons, who were sleeping over Melendez's mother's house. The officers each testified that Cedano continued to speak to them in English, with no perceived difficulty in either understanding or speaking English. Cedano never told the police that she did not understand either the officers' questions or the contents of the two consent forms. Cedano never asked for an interpreter. Most importantly, Cedano signed two express consent forms. See State v. O'Dell, 576 A.2d 425 (R.I. 1990) (where police sought consent to search a woman's home for her son who was suspected of rape, and for whom an arrest warrant had been issued. The court found that her consent was "freely and voluntarily" given even though the woman testified that she gave consent only because she believed that if she didn't give consent, the police would have searched her home anyway.)
The Court, in acting within its discretion, accepts the testimony of the officers, Duquette v. Godbout, 471 A.2d at 1363 (citing Rodrigues v. Santos, R.I., 466 A.2d 306, 312 (R.I. 1983)), which is that Cedano was not handcuffed prior to her returning to the apartment with McGrath and that Cedano spoke and understood English with no difficulty. Cedano has lived in the United States for ten years, and she attended school through the tenth grade. She has an eighteen-year-old sister who speaks English fluently. In addition, she had her two children at Women and Infants Hospital in Providence, Rhode Island, where three times per week throughout her pregnancy, she saw a doctor who did not speak Spanish.
By a fair preponderance of the evidence, this Court finds that Cedano's signing the consent forms, despite their being written and read to her in English, establishes that Cedano's consent was "freely and voluntarily" given. The Court rejects Cedano's contention that her actions were "no more than acquiescence to a claim of lawful authority." See Bumper v. NorthCarolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802 (1968). For the foregoing reasons, Cedano's motion to suppress is denied.