**STATE**

**v.**

**Howard SIMPSON and Steven Simpson.**

**No. 89–599–C.A.**

Supreme Court of Rhode Island.

July 24, 1991.

Jane M. McSoley, Sp. Asst. Atty. Gen., Providence, for plaintiff.

Paula Rosin, Barbara Hurst, and Richard Casparian, Office of Public Defender, and Dian Wood Picone, Brosco & Brosco, P.C., Providence, for defendants.

## OPINION

WEISBERGER, Justice.

This case comes before us on the appeal of the defendants from judgments of conviction entered in the Superior Court wherein both defendants were found guilty of (1) conspiracy to murder Noel Simpson (unrelated to defendants), (2) assault with intent to murder Noel Simpson, (3) assault with a dangerous weapon, to wit a handgun, on Nathan Beatty, and (4) assault with a dangerous weapon, to wit a handgun, on Patricia McCabe. We vacate the convictions and remand the case for a new trial. The facts of the case insofar as they are pertinent to this appeal are as follows.

Nathan Beatty (Beatty) had formed a suspicion that Danny Simpson (Danny) had broken into his apartment on Mawney Street in the city of Providence sometime during the weekend of June 1 and 2, 1985. Thereafter he confronted Danny (the brother of defendants in the case at bar) and accused him of the theft of a television set, cash and some gold jewelry. Danny denied having anything to do with the break-in and theft. The bad feeling between the two escalated, and on June 2 Beatty came to the home of Danny's mother, Jean Jest, also on Mawney Street, accompanied by Noel Simpson, Calvin Beatty, Manny Beat-ty, Michael Spruill, Joseph Beatty, Patricia McCabe, and Roxanne Beatty. Some members of this group (hereinafter referred to as the Beatty group) were armed with knives and baseball bats, although the purported purpose of their attendance was to help Beatty move from his apartment wherein the break-in had occurred. As the Beatty group was engaged in removing furniture from the apartment, according to Jean Jest, they were also harassing the Simpson family by uttering epithets and challenges to Danny, who with Steven Simpson (Steven), was on the Jest's second-floor porch overlooking Mawney Street. Later Howard Simpson (Howard) and two friends arrived in a taxicab and entered the Jest home.

Shortly thereafter, Danny, Howard, and Steven Simpson walked over to the Beatty group, allegedly to try to straighten things out. However, Danny challenged Noel Simpson (Noel) to physical combat. Suddenly two shots rang out, and Noel fell to the ground, seriously injured. Members of the Beatty group testified that Danny had fired the shots. Another witness stated that Howard beat Noel about the head with a bat or billy club. Noel Simpson had sustained a single gunshot wound to the left lower back and a laceration to the back of the head. He was taken to a hospital where he remained about one week.

The defense of both Howard and Steven, as well as that of Danny (who is not before this court at this time), was that it was a member of the Beatty group who had fired the gun, accidentally wounding Noel.

In support of their appeal defendants raise two issues. One is applicable only to Howard and will be considered first. The second issue is applicable to both defendants.

## I

THE FAILURE TO INSTRUCT THE JURY THAT NO INFERENCES MIGHT BE DRAWN AGAINST HOWARD SIMPSON FOR NOT TESTIFYING AT THE TRIAL

■ During the course of the presentation of the defense in the joint trial, Steven

and Danny testified in their own behalf. Howard did not take the stand. At the close of the evidence counsel for Howard filed seven written requests for instructions. Request No. 4 read as follows:

"The Defendant, Howard Simpson, did not testify [and] you are instructed not to draw any unfavorable inferences because he has elected to remain silent, a right which is guaranteed to him under the Fifth Amendment to the Bill of Rights of the United States Constitution and the applicable provisions of the Rhode Island Constitution."

During the course of the trial justice's charge to the jury, he did not give this instruction. At the close of the charge, the attorney for Howard objected to the failure to give requested instruction No. 4. Although the trial justice did not give the requested instruction, he did state in the course of his charge to the jurors that they should consider only the evidence in the record, not what they did not hear, and further charged that defendants are under no obligation to prove or disprove anything in our system of jurisprudence or to give testimony or to go forward with a defense. "The defendant may choose to testify or not to testify."

It should be emphasized here that three defendants were tried together; two of the defendants testified, but Howard did not. Consequently the clearest and most unequivocal instruction was required to the effect that no inference should be drawn against Howard for his failure to testify.

In *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), the Supreme Court of the United States held that the giving of an instruction upon the defendant's request that a jury may draw no adverse inferences against a defendant based upon his failure to testify is a mandatory constitutional obligation. The Court's comment upon this constitutional imperative is instructive:

"The freedom of a defendant in a criminal trial to remain silent 'unless he chooses to speak in the unfettered exercise of his own will' is guaranteed by the Fifth Amendment and made applicable to state criminal proceedings through the Fourteenth. *Malloy v. Hogan*, 378 U.S. [1], at 8 [84 S.Ct. 1489; at 1493–94, 12 L.Ed.2d 653 (1964)]. And the Constitution further guarantees that no adverse inferences are to be drawn from the exercise of that privilege. *Griffin v. California*, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)]. Just as adverse comment on a defendant's silence 'cuts down on the privilege by making its assertion costly,' *id.*, at 614 [85 S.Ct. at 1232–33], the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the privilege. Accordingly, we hold that a state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify." *Id.* at 305, 101 S.Ct. at 1121–22, 67 L.Ed.2d at 254.

The Court also noted that jurors are not experts in legal principles and that if uninstructed on the subject, they might be inclined to speculate concerning the reasons for a defendant's silence and view the exercise of the privilege against testifying as a shelter for wrongdoers.

The Supreme Court of the United States has steadfastly maintained that a defendant's declining to testify is protected by the Fifth Amendment privilege against self-incrimination and that no adverse inferences may be drawn by the trier of fact therefrom since its landmark case in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Indeed the Court has held that a prophylactic instruction admonishing the jury that no adverse inferences may be drawn from the failure to testify might properly be given even over the objection of the defendant. *Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978).

The state argues that this failure to instruct in accordance with Howard's request was harmless error because the judge had in substance given such an ad-

monition during the voir dire colloquy incident to the selection of the jurors. Nevertheless, we are not persuaded that the error in failing to give the requested instruction was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We certainly approve of the giving by a trial justice of preliminary admonitions when addressing the venire of jurors and at the time of the swearing-in of a jury panel. Such instructions tend to focus the jurors' attention upon propositions of law that will be relevant to the case as the evidence unfolds. However, these preliminary admonitions cannot and must not serve as substitutes for a comprehensive and complete set of instructions upon the law following final arguments at the end of the trial. The instant case was tried over a period in excess of two weeks. It cannot be assumed beyond a reasonable doubt that the jurors would continue to have in mind the preliminary admonitions given by the trial justice at the beginning of the trial on October 26, 1988, when they completed their deliberations on November 16, 1988. Such an assumption would be particularly dubious in light of the fact that two of the defendants did testify in their own defense whereas Howard did not. Consequently we are of the opinion that the failure to give the requested instruction constituted prejudicial error.

## II

THE FAILURE TO GRANT A MISTRIAL OR CONTINUANCE BY REASON OF THE STATE'S NONDISCLOSURE OF A NEUTRON–ACTIVATION TEST

◼ Both defendants in the case at bar, Howard and Steven, had filed requests for discovery including the results of any scientific tests pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure. However, it was not until after the state had concluded its presentation of evidence that counsel for defendants learned that a neutron-activation test had been performed on Danny and Howard by the Providence police approximately one hour after the shooting had taken place. Apparently,

the Providence police had neglected to inform the staff of the Attorney General that such a test had been performed. Consequently no information regarding the test had been supplied in the course of discovery. Officer Stephen Melaragno testified as a witness for the state concerning certain firing tests that he had performed on the gun which had been found at the scene. He had earlier filed a report that he had test-fired the weapon and found it operable. During cross-examination Danny's attorney inquired concerning the neutron-activation test, which was designed to determine whether residue from the discharge of a firearm has been deposited on the hands of a person suspected of discharging the weapon. The officer explained the procedure for the taking of such tests and stated that a gun of the type found at the scene of this crime would have left deposits on the clothing and the hands of a person who had fired it. He further explained that the testing was done by means of swabbing the hands of a suspect. The swabs would then be sent to a laboratory for analysis.

After hearing this testimony Danny and Howard reported to their attorneys that such a swabbing procedure had been performed upon them shortly after their arrival at the police station. They had not realized the significance of this activity until hearing the testimony of Officer Melaragno. The next morning this information was placed upon the record, and the state confirmed that such swabbing tests had been performed within an hour of Danny and Howard's arrival at the police station.

On November 7, the following Monday, counsel for defendants asked for a continuance so that they might seek the assistance of an expert witness. They pointed out that they had been unable to locate such an expert since the preceding Friday when this information first came to their attention.

The state elicited testimony from Officer Lewis DeFrances, who was employed by the Bureau of Criminal Identification at the time of defendants' arrest. He confirmed that the swabs had been sent to the Feder-

al Bureau of Investigation (FBI) for analysis for gun-powder residue. He testified that he had learned only recently that a letter had been received from the FBI concerning this test. Because of an oversight on his part, the FBI letter had not been furnished to the detective in charge of the investigation. Consequently the paralegal whose duty it had been to assemble the file for the Department of the Attorney General was unaware that such a test had been performed, and its results were not included in the information packet.

The trial justice found as a fact that the failure to include the test results in the discovery material furnished by the state was not deliberate. Although the test results were negative, the trial justice further found that the FBI report was not exculpatory. He denied the motion for a mistrial and also denied the request for a continuance, holding that counsel for the defense had had ample time during the course of the trial to seek expert testimony and to prepare to utilize this information for defense purposes. He further determined that the assistance of the court in obtaining the testimony of the FBI agent who had conducted the test should be sufficient since the agent's testimony would be more beneficial to the defense than to the state. The trial justice also placed some responsibility upon defendants whose hands had been swabbed for not reporting that fact to their attorneys. The defendants argue to this court, as their counsel argued to the trial justice, that they were unaware of the significance of the swabbing or the purpose thereof until they heard the testimony of Officer Melaragno.

Consequently defendants presented Special Agent John Riley, the FBI agent who had performed the test, as their witness. He was qualified as an expert in the field of neutron-activation testing and analysis. He testified that the specimens taken from Danny's and Howard's right and left hands revealed no significant amount of antimony or barium. He cautioned, however, that the test was not conclusive. He pointed out that some guns do not deposit residue and that the gases carrying such deposits can be carried away by wind or wiped off.

He also noted the possibility that one who fired such a gun might wash his hands after the shooting or might have been wearing gloves.

After the conclusion of the evidence presented by defendants, the state presented Kathleen Brennan (Brennan) as a rebuttal witness. She testified that Danny wore gloves when he shot Noel Simpson. Brennan had been listed as a witness for the state in discovery material and a copy of her statement referring to the gloves had been provided. Apparently defense counsel had overlooked the significance of this portion of the discovery material until Brennan was presented as a witness. Her testimony would only be of importance in the light of the negative neutron-activation report. In that context it is not an overstatement to suggest that her testimony had a devastating effect upon the defense.

We have often stated that Rule 16 requires that discovery be made in a timely manner, *see State v. Verlaque*, 465 A.2d 207 (R.I.1983), in order that defense counsel may marshal the information contained in the discovery material in an orderly manner. In *State v. Coelho*, 454 A.2d 241 (R.I.1982), we observed that the disclosure of extensive discovery materials just prior to trial made the task of defense counsel overwhelmingly difficult and reduced their effectiveness.

We also observed in *State v. Darcy*, 442 A.2d 900 (R.I.1982), that the assistance of counsel may be diminished or eliminated by providing information of great importance (admission by the defendant) in midtrial so that the strategy adopted by the defense is rendered ineffective or even counterproductive.

In the case at bar the sudden discovery of the fact that a neutron-activation test had been conducted completely distracted defense counsel from their former strategic plans to present the defense. They were not given an opportunity to reevaluate their tactical plans or even to attempt to find an expert witness of their own choosing. Consequently they fell into the trap of presenting the only witness who

was available on the subject, an FBI special agent who could scarcely be regarded as a sympathetic witness. But most significantly, their failure to review the discovery material on Brennan caused their tactic of presenting the special agent to give rise to a mortal blow to the credibility of the entire defense.

■ Trial lawyers must be able to adapt strategy to evolving circumstances. They must be able to think upon their feet. However, very few trial lawyers are superhuman. When, because of a failure to furnish discovery on the part of the state, a highly significant piece of information, hitherto unexpected, becomes available and when that information has a potential to alter the course of the defense completely, counsel is reasonably entitled to an effective remedy. The remedy may either be a mistrial or a continuance of sufficient duration to seek expert testimony of their own choosing and to reevaluate all the discovery material that may have a bearing upon use of that information. To require that this be done in the heat and hurly-burly of the trial process is to place a burden upon counsel, that, as illustrated in this case, can scarcely be successfully borne.

Therefore, we are of the opinion that the trial justice erred in refusing to grant the defendants either a mistrial or a continuance for an adequate period in order to adjust to this new and unexpected information. As demonstrated by the events that occurred in this case, the error was prejudicial to the defendants.

For the reasons stated, the defendants' appeal is sustained and the convictions of Howard Simpson and Steven Simpson are vacated. The papers in the case may be remanded to the Superior Court for a new trial.