STATE

v.

**Willie SCURRY.**

No. 91–320–C.A.

Supreme Court of Rhode Island.

Feb. 1, 1994.

Jeffrey Pine, Atty. Gen., Annie Goldberg, Aaron Weisman, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine Gibran, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

LEDERBERG, Justice.

Before this court is the appeal of Willie Scurry (defendant) from a Superior Court judgment of conviction. The decisive issue is whether the defendant should have been granted a new trial because of the state's midtrial misrepresentation that the only corroborating witness the defendant planned to call had an extensive criminal record. The error forced the defendant to abandon his opening promise to the jury that a witness would corroborate his testimony. We are of the opinion that the state's inadvertent error denied the defendant the right to present his fullest and best defense. Therefore, for the reasons stated herein, we sustain the defendant's appeal and remand for a new trial.

### I

#### Procedural History

The defendant made three motions for a new trial subsequent to his June 21, 1990 conviction. The first motion was denied by the Superior Court on July 3, 1990. The defendant did not appeal from the denial of that motion. Rather, on August 21, 1990, defendant filed a notice of appeal from the judgment of conviction. After filing the notice of appeal, but prior to the docketing of the case in this court, defendant filed a second motion for a new trial on April 19, 1991, pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure (hereinafter April 1991 motion). The defendant's April 1991 motion was based on defense counsel's posttrial discovery that an assistant attorney general had mistakenly informed defense counsel that the only corroborating witness that defendant had selected to testify pos-

sessed an extensive criminal record. This misrepresentation occurred after the state had rested and just prior to defendant's presentation of his case. According to defense counsel, the erroneous information prompted a midtrial defense decision not to call the corroborating witness. On May 21, 1991, the Superior Court denied defendant's second motion for a new trial.

Thereafter, defendant filed a notice of appeal from the May 21, 1991 denial. After defendant executed a waiver of the prebriefing process, the case was placed on the regular calendar for full briefing and oral argument. Prior to oral argument, however, defendant requested a limited remand order from this court to enable the Superior Court to conduct an evidentiary hearing on a proposed third motion for a new trial. The case was then remanded by this court to the Superior Court on September 9, 1991, and on September 12, 1991, defendant filed a third motion for a new trial (hereinafter September 1991 motion). The September 1991 motion offered two separate grounds that defendant argued amounted to newly discovered evidence.

The defendant's first ground was his postverdict discovery that Lieutenant Gordon Tempest of the Woonsocket police department (Tempest), a leading investigator in defendant's case, was under investigation for improprieties in another case during the pendency of defendant's case. Relying on State v. Beaumier, 480 A.2d 1367 (R.I.1984), defendant argued that he should have been informed that Tempest was under investigation for witness intimidation, suppression of evidence, and conspiracy to obstruct justice in conjunction with the Doreen Picard murder investigation.[1] One of defendant's defenses at trial was that he was set up by Tempest. To buttress the allegation, defendant pointed out (1) that Tempest named defendant as a possible suspect and placed his photograph in a photo array even before Tempest had the victim's description of her assailant; (2) that Tempest went alone to view tire tracks alleg-

---

1. Tempest was convicted in Superior Court on July 6, 1993, on multiple counts of perjury relating to the Picard murder investigation.

edly made by the stolen car of the assailants, but never produced the photographs of the tracks that he allegedly ordered; (3) that Tilyn Frisby (Frisby), an eyewitness, confided to Tempest that she recanted her initial identification of defendant because she was afraid he could see her; but that after consulting with Tempest, without returning to the lineup room to confirm her identification, she named defendant as the assailant; and (4) that fingerprint evidence, all of which exonerated defendant, was not sent to the FBI in a timely fashion.

The defendant claims that at the time of trial, he argued all these factors to the jury but was unable to tell the jury why "Tempest was orchestrating his folly." According to defendant, the missing piece to the puzzle was the fact that Tempest, himself, was under investigation. The defendant reasoned that, like the officer in *Beaumier*, Tempest could have been attempting to "curry favor" and redeem himself in the eyes of his colleagues by singlehandedly solving an important case. Because he was denied this information about Tempest, defendant argued, relying on *Beaumier*, that defendant was denied his right to bring to the jury's attention any motivation Tempest might have had for testifying. *Beaumier*, 480 A.2d at 1372.

The second ground for defendant's September 1991 motion was the state's alleged failure to comply with Rule 16 of the Superior Court Rules of Criminal Procedure. The defendant argued that Jo–Jo Spearman, an informant who had provided the Woonsocket police with reliable information in the past, had told an off-duty Woonsocket police officer that defendant "was not the one that did it" and that the real perpetrator was a man named "Bernard." Tempest testified on December 10, 1991 that the off-duty police officer reported to Tempest that an informant had identified an individual named "Bernard" as defendant's partner. Tempest alleged that he was never told that defendant was not the assailant. Tempest said he never investigated the informant's tip because he believed "Bernard" to be Bernard Perry, defendant's friend and a possible second assailant in the crime. Tempest testified that at

the time he received the informant's tip, he already had ruled out Bernard Perry as defendant's collaborator because defendant and Bernard Perry had fought before the incident. Prior to trial, a report was never written making reference to the informant's tip, and defendant was never told about the informant or the existence of a second suspect. The defendant maintains that it was a breach of the rules of discovery not to disclose to defendant the existence of another suspect so that, at a minimum, defendant himself could investigate whether the existence of the second suspect would have exonerated defendant. According to defendant, the fact that the state did not reveal this second suspect to him justified a granting of a new trial.

On October 13, 1992, the Superior Court rejected defendant's arguments and denied the September 1991 motion on both grounds. The files were then returned to this court pursuant to our remand order.

We are of the opinion that defendant's April 1991 motion for a new trial was erroneously denied. Therefore, on that basis we reverse and remand for a new trial.

## II

### Facts

A brief summary of the pertinent facts in this case follows. On November 15, 1988, at approximately 9:30 p.m. two men followed Janet Moss (Moss)[2] into her apartment house located at 186 Waterman Street, Providence, Rhode Island. After breaking down Moss's locked apartment door, the men displayed a knife and demanded Moss's money. When Moss was only able to produce a few dollars, the men dragged her from the apartment and into a stolen car. The men then drove to a secluded spot in Woonsocket where they sexually and physically assaulted Moss.

Frisby and her fiancé, also tenants at 186 Waterman Street, witnessed the men taking Moss from the apartment house. Because the couple did not have a phone in their apartment, they went out to call the police.

2. We have adopted a fictitious name in order to      protect the identity of the victim.

Before reaching a phone, they flagged down a passing police cruiser and reported the incident.

Early the next morning, after Moss had preliminarily identified defendant in a photo array, the Woonsocket police arrested defendant on the basis of an outstanding Municipal Court warrant for failure to appear for a traffic violation. That same morning defendant was identified by Moss and Frisby in a lineup conducted at the Woonsocket police station.

The grand jury subsequently indicted defendant on ten separate counts. After the trial the jury deliberated for three days and found defendant guilty on eight counts relating to the abduction and sexual assault of Moss.

The defendant raises several issues on appeal with respect to the denial of the April 1991 and September 1991 Rule 33 motions for a new trial and to several issues that stem from the actual trial. Because we are of the opinion that defendant's April 1991 motion for a new trial was erroneously denied, we need not reach the other issues raised by defendant. But prior to discussing the grounds on which we reverse, we briefly address defendant's claim that his arrest based on the Municipal Court warrant violated his constitutional rights.

### · III

### *The Arrest*

Prior to trial defendant moved to suppress Moss's and Frisby's in and out-of-court identifications, alleging that the identifications were fruits of an unlawful arrest. The trial justice denied defendant's motion to suppress, after finding that defendant's arrest on an outstanding Municipal Court warrant was valid. We agree with the trial justice.

After Moss made a tentative photo identification of defendant, the Woonsocket police arrested him on a two-month-old Municipal Court warrant. Immediately after his arrest, defendant was placed in a lineup and questioned about Moss's kidnapping and assault. No further action on the Municipal Court warrant was taken, nor was the warrant ever returned. The defendant argues that his arrest on the Municipal Court warrant was a pretext for placing him in a lineup and questioning him. Therefore, according to defendant, because a pretextual arrest is unlawful, the fruits of the arrest should have been suppressed.

■ Numerous jurisdictions have condemned the practice of making seemingly valid arrests for the sole purpose of carrying out an otherwise invalid search and seizure. Since the *United States Supreme Court's denunciation of the Practice in United States v. Lefkowitz,* 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932). *See Taglavore v. United States,* 291 F.2d 262 (9th Cir.1961); *McKnight v. United States,* 183 F.2d 977 (D.C.Cir.1950); *Richardson v. State,* 288 Ark. 407, 706 S.W.2d 363 (1986); *Harding v. State,* 301 So.2d 513 (Fla.Dist.App.Ct.1974), *cert. denied,* 314 So.2d 151 (Fla.1975). Dubbed "pretextual arrest," this practice violates an individual's Fourth Amendment rights because it involves using a "sham" or "pretext" arrest "as an excuse for making a search." *Taglavore,* 291 F.2d at 265–66. There is no bright-line test for determining whether an arrest is unlawfully pretextual. *See United States v. Trigg,* 878 F.2d 1037, 1039 (7th Cir.1989) *aff'd,* 925 F.2d 1064 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 449 (1991); *Richardson,* 288 Ark. at 410–11, 706 S.W.2d at 365. The issue must be decided on a case-by-case basis, and the inquiry must focus on the intent and motivation of the officers making the arrest. *McKnight,* 183 F.2d at 979; *United States v. D'Alo,* 486 F.Supp. 945, 949 (D.R.I. 1979). An arrest is not, however, fatally pretextual merely because the police officers have a dual motive for making the arrest. *See, e.g., Hines v. State,* 289 Ark. 50, 55, 709 S.W.2d 65, 68 (1986). Rather the search is unreasonable and rises to the level of a constitutional violation when the arrest becomes incident to the search, rather than the search being incident to the arrest. *Taglavore,* 291 F.2d at 265; *McKnight,* 183 F.2d at 978.

■ In the instant case, defendant's arrest based on the outstanding Municipal Court warrant did not violate defendant's Fourth Amendment rights. Prior to the execution of the warrant, Moss had identified defendant in a photo array. The fact that

the warrant would not have been executed on that night *but for* Moss's identification alone does not amount to a constitutional violation. More is required to make defendant's arrest fatally pretextual and thus render his lineup identification unreasonable under Fourth Amendment standards. In *Taglavore,* for example, the arrest was fatally pretextual because of an ulterior motive behind *securing* the arrest warrant. *Taglavore,* 291 F.2d at 265. In *United States v. Edmons,* 432 F.2d 577 (2d Cir.1970), the out-of-court identifications were suppressed because the FBI deliberately violated the defendants' constitutional rights by conducting a sweeping roundup of individuals for the sole purpose of securing an identification, without any prior descriptions or identifications by witnesses. *Id.* at 580–81, 583–84. Likewise, the Fourth Amendment is violated when police execute an arrest warrant exactly coincident with an individual's presence at a particular place in order to search that place incident to the arrest. *United States v. Carriger,* 541 F.2d 545, 553 (6th Cir.1976); *State v. Hoven,* 269 N.W.2d 849, 852–53 (Minn.1978).

These scenarios were absent in the instant case. The fact that defendant was a suspect in the kidnap and assault of Moss is insufficient by itself to invalidate his arrest and suppress the in and out-of-court identifications. As the trial justice noted, Municipal Court warrants often remain dormant until the individual is brought before the police on another matter or until a police department makes a concerted effort to execute the warrant. In situations such as the present one, in which a defendant already had been identified preliminarily in a photo array, the execution of a valid warrant does not violate an individual's constitutional rights. Therefore, we find that defendant's arrest based on the Municipal Court warrant was proper, and that the trial justice did not err by admitting the subsequent identifications.

We now address defendant's challenge to the denial of his April 1991 motion for a new trial.

## IV

### *The Error*

■ On May 19, 1989, pursuant to Rule 16(a)(8) of the Superior Court Rules of Criminal Procedure, defendant filed a motion for discovery and inspection requesting "all reports or records of prior convictions" of any "persons whom the defendant expects to call as witnesses." In response the state on May 15, 1990 provided defendant with Bureau of Criminal Investigation (BCI) reports for two potential defense witnesses who possessed minor criminal convictions. The state did not, however, provide defendant with a BCI report for putative defense witness Raymond Greeno (Greeno). After the trial had begun, but prior to defendant's presentation of his case, the assistant attorney general prosecuting the case and counsel for defendant discussed, among other things, whom the defense planned to call to testify. When defense counsel revealed that Greeno would be testifying on defendant's behalf, the assistant attorney general then showed defense counsel a Woonsocket police criminal record card that showed an extensive criminal record presumably for Greeno. The police card displayed, *inter alia,* apparent convictions for kidnapping and abominable and detestable crimes against nature. According to defense counsel, the assistant attorney general never relinquished possession of the police card. Rather, defense counsel, relying on the assistant attorney general's representation that the record was Greeno's, merely glanced at the card and never took possession of it. Therefore, given the mistaken belief that Greeno was the same individual listed on the police card and given the nature of Greeno's purported offenses, defense counsel changed tactics midtrial and decided not to call Greeno as a defense witness because his testimony could be easily impeached.

Several months later, in preparing defendant's case for appeal, defense counsel discovered that the state had erroneously produced the criminal record of one Robert K. Greeno rather than Raymond Greeno. The defendant, therefore, based on the discovery that Greeno did not, in fact, have a criminal record, filed the April 1991 motion for a new trial, citing the newly discovered evidence and the interest of justice as grounds therefor.

In denying the motion for new trial based on newly discovered evidence, the trial justice found that defendant had not met the test set forth in *State v. Brown*, 528 A.2d 1098 (R.I.1987). In addition, the trial justice found that the interests of justice did not warrant the granting of a new trial because, even if Greeno's testimony had been admitted into evidence, it would not, according to the trial justice, have assisted the factfinder in determining whether defendant was or was not in Providence on the evening of November 15, 1988.

According to defendant, although Greeno is not an alibi witness *per se*, Greeno not only could have corroborated defendant's own testimony, but also would have provided objective testimony concerning defendant's demeanor and state of mind on the night of the offense. At trial, defendant testified that on the fifteenth of November he spent most of the day in bed nursing a bite to his thumb that he had suffered the night before. According to the medical records introduced at trial, defendant had been prescribed antibiotics and four Tylenol 3 tablets to alleviate the pain. The defendant testified, however, that he was in extreme pain and his thumb was throbbing, so at approximately 5:30 p.m. on the evening of November 15th, he went to see Greeno in order to obtain some pain medication.

According to defendant, Greeno's testimony would confirm that defendant was at Greeno's house at approximately 6 p.m. on November 15, 1988, and that Greeno gave defendant a muscle relaxer and pain killer. In addition, Greeno allegedly would be able to relate the fact that defendant was in pain and discomfort at six o'clock that night. According to defendant, Greeno's testimony would have made it extremely unlikely that someone in defendant's condition could recover within three hours to such an extent that he would be able to plot and carry out the deeds defendant was accused of committing. At a minimum, according to defendant, Greeno's testimony would have been sufficient to raise a reasonable doubt in the minds of the jurors. Therefore, also according to defendant, the state's production of the wrong police card forced defendant to withhold the only corroborating witness defendant was prepared to have testify and denied defendant the opportunity to present the fullest and best defense available.

When presented with a motion for a new trial, the trial justice must exercise independent judgment in determining whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt. *State v. McGranahan*, 415 A.2d 1298, 1302 (R.I.1980). This court will reverse a trial justice's ruling on a motion for a new trial only if we find that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. *State v. Dame*, 560 A.2d 330, 332–33 (R.I. 1989). In the instant case, we find that the midtrial presentation of the wrong police card denied defendant a crucial opportunity to present the best and fullest defense. Thus the trial justice erred in denying defendant's motion for new trial.

Due process requires that every defendant have ample and sufficient opportunity to establish the best and fullest defense available to him. *State v. Leonardo*, 119 R.I. 7, 11, 375 A.2d 1388, 1390 (1977). We have also stated that it is imperative that defendants come to trial as well-prepared as possible to raise reasonable doubt in the minds of one or more jurors. *State v. Concannon*, 457 A.2d 1350, 1352–53 (R.I.1983). Accordingly, we have consistently condemned the untimely disclosure of extensive discovery material just prior to trial or in the midst of trial. *State v. Simpson*, 595 A.2d 803, 806–07 (R.I. 1991); *State v. Darcy*, 442 A.2d 900, 903 (R.I.1982). Such disclosure not only makes the task of defense counsel difficult, it also reduces counsel's effectiveness by forcing changes in defense strategy midtrial. *Simpson*, 595 A.2d at 807.

In the instant case there was little definitive physical evidence connecting defendant to the offenses he was charged with committing. For example, none of the fingerprints found in the stolen car or in the apartment house matched defendant's fingerprints. In addition, defendant was definitively excluded as the source of blood stains found on Moss's sweater. The defendant was also *definitively* excluded as the source of seven out of the

nine semen stains found on Moss's clothing, and was identified as merely a "possible" source of the remaining two semen stains.[3] The guilty verdict, therefore, rested on the strength of Moss's and Frisby's identifications. As such, the defense strategy rested on impeaching the credibility of those identifications as well as the jury's perception of defendant's testimony.

During his opening statement, defense counsel introduced defendant's case by promising the jurors that they would hear witnesses who would corroborate defendant's testimony about his presence elsewhere on the evening of November 15. But the defense's plan to present the corroborating testimony of Greeno was thwarted by the production of the wrong police report. At the point in the trial when the defense could have presented witness testimony, defendant alone testified about his actions and demeanor on November 15, 1988. But for the state's misrepresentation, Greeno's testimony could have supported and corroborated defendant's own testimony and could have influenced the jury's perception of defendant's credibility.

The defendant argues that the significance of Greeno's testimony went beyond that of a corroborating witness. Greeno was chosen to testify because of his objective relationship to defendant. Unlike potential alibi witness Pollyanna Ruff, defendant's girlfriend, Greeno had neither a close relationship with defendant, nor vulnerability to impeachment because of prior criminal convictions. The defendant, who did not have a criminal record himself, preferred to rely on the corroborating testimony of Greeno, who had no criminal record, rather than place his own credibility at risk by presenting the testimony of witnesses with minor criminal records.

The significance of Greeno's absence was pointedly noted during the trial by the prosecutor's direct question to defendant, "Where's Ray Greeno now?" Forced to abandon Greeno, defendant could not answer.

The assistant attorney general further emphasized the absence of a corroborating witness by telling the jury to compare the testimony of defendant to that of Frisby: Frisby's testimony was supported in part by Moss; but defendant was unable to present any support for his testimony. Given the facts in this case, we find that defendant was denied the opportunity to present the best and fullest defense possible. Due-process considerations, as well as the interests of justice, require granting defendant a new trial.

In conclusion we note that the defendant does not allege, nor do we question, the assistant attorney general's good-faith belief that he was producing the correct criminal record. We believe, however, that this case demonstrates the hazards of untimely production of discovery material. We have stated that the purpose of requiring the timely production of discovery material is to provide "defense counsel [the opportunity to] marshal the information * * * in an orderly manner." *Simpson,* 595 A.2d at 807. Otherwise, as in the instant case, the "assistance of counsel [is] diminished or eliminated * * * so that the strategy adopted by the defense is rendered ineffective or even counterproductive." *Id.* (citing *Darcy,* 442 A.2d at 903).

Accordingly, for the reasons stated herein, the defendant's appeal is sustained, the judgment of conviction is vacated, and the case is remanded to the Superior Court for a new trial.

---

**3.** Robert Grispino, an FBI agent, testified that because defendant is a "non-secretor," Grispino was unable to determine defendant's blood-type through body fluids. However, Grispino was able to exclude defendant as the source of certain stains. A "secretor" genotype allows sugar transferases to build up a specific carbohydrate polymer on red blood cell surfaces or on soluble products secreted in body fluids. The sugars confer antigen specificity that can be detected in a secretor. Detection is by serology—an antibody reaction with such antigens. J.S. Thompson & M.W. Thompson, *Genetics in Medicine,* ch. 9 at 207–10 (3d ed. 1980).