June 24, 2021

**Supreme Court**

No. 2018-234-C.A.
(P1/16-1542A)

State                          :

    v.                         :

Matthew Sheridan.              :

NOTICE:   This opinion is subject to formal revision
before publication in the Rhode Island Reporter.  Readers
are requested to notify the Opinion Analyst, Supreme
Court of Rhode Island, 250 Benefit Street, Providence,
Rhode Island 02903, at Telephone (401) 222-3258 or
Email opinionanalyst@courts.ri.gov, of any typographical
or other formal errors in order that corrections may be
made before the opinion is published.

State            :

v.            :

Matthew Sheridan.     :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, Matthew Sheridan, appeals following the entry of a November 21, 2017 judgment of conviction and commitment reflecting the fact that a jury found him guilty of one count of first-degree sexual assault.  On appeal, he contends that the trial justice abused his discretion: (1) "when he overruled [Mr.] Sheridan's objection to Dr. [Amy] Goldberg's testimony * * * [because] [t]he state's disclosure was too late and was wholly insufficient, [Mr.] Sheridan was prejudiced, and the trial justice's remedy did not ameliorate the prejudice;" (2) "when he admitted Dr. Goldberg's testimony because it invaded the province of the jury;" and (3) "when he permitted the prosecution to refer to the complainant as 'the victim,' which prejudiced the jury prior to trial[.]"

- 1 -

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Travel

On May 11, 2016, Mr. Sheridan was charged by indictment with one count of first-degree sexual assault, alleging that he had "engage[d] in sexual penetration, to wit, mouth to penis, with [Jasper[1]], by force or coercion, in violation of §11-37-2 of the General Laws of Rhode Island * * *."[2] The record reflects that Jasper was fifteen at the time of the assault at issue. It is also important to note at the outset that Mr. Sheridan's defense was premised on the contention that what transpired between Jasper and him was consensual. Additionally, the crux of the issue on appeal is the admissibility of testimony by Amy Goldberg, M.D., to the effect that it was her opinion, to a reasonable degree of medical certainty, that it is possible for an adolescent male to become erect and to ejaculate in response to an unwanted touching or sexual assault.

---

[1] We refer pseudonymously to the complaining witness, who was a minor at the time of the incident in question.

[2] Mr. Sheridan was also indicted on one count of second-degree sexual assault. On June 12, 2017, the state dismissed this charge pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

A trial ultimately ensued over five days in June of 2017.  We relate below, in chronological order, the salient aspects of what transpired at trial.

**A**

***Voir Dire***

The jury selection in this case began on June 12, 2017.  During the course of *voir dire*, the state referred to Jasper as the "victim * * *."  Defense counsel then moved during a sidebar to have the word "complainant" or "complaining witness" used instead of "victim."  The trial justice stated as follows:

> "I agree with you.  I probably would have said it on my own. I didn't catch it.  I agree.  Let's refrain from using that term. I think the term complaining witnesses or complainant but not victim.  I agree.
>
> "* * *
>
> "It has a negative connotation obviously and I would ask that you not reference the complaining witness with that word.
>
> "* * *
>
> "* * * I know it is hard to, we typically use that term when we are talking off the record but here with their minds completely fresh and impressionable we probably want to avoid it."

Thereafter, during *voir dire*, the prosecutor referred to Jasper as the "victim" on three occasions.  There were no objections to any of those three uses of the word "victim" with respect to Jasper by the prosecutor.  At the close of *voir dire*, defense

- 3 -

counsel represented that the jury was satisfactory to Mr. Sheridan, without any further comment.

## B

## Objection to the Testimony of Dr. Goldberg

On June 12, 2017, defense counsel filed a written objection to the admission of Dr. Goldberg's testimony on the grounds that it was "[l]ate and [i]ncomplete [d]iscovery;" "[i]mproper [e]xpert [t]estimony;" and "[b]olstering * * *." Specifically, he contended that notice of Dr. Goldberg's testimony was presented to the defense only on Friday, June 9, 2017, two days prior to the start of trial, which did not provide the defense with "enough time properly to counter it." He further stated that the testimony invaded the "province of the jury to determine whether or not [Jasper's] responses to these forced sexual encounters actually constitutes evidence of consent." Mr. Sheridan added that the jurors were capable of making the necessary credibility determination as laypeople and did not need an expert opinion. Lastly, he averred that the testimony at issue would constitute bolstering "since the sole purpose is to justify [Jasper's] reaction to alleged acts of sexual assault by means of an expert medical opinion." He then requested "a Daubert hearing"[3] prior to trial and a continuance if the testimony was to be admitted.

---

[3]     *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Thereafter, a hearing on defendant's objection was held on Tuesday, June 13, 2017, after the impaneling of the jury was completed. At that hearing, defense counsel stated as follows:

> "[T]his past Friday at noontime I received formal notification of Dr. Goldberg as a potential witness to testify and I will [cite] the description. Dr. Goldberg is expected to testify regarding the physical responses of adolescent young men to stimuli slash physical contact.
> "On Monday I received from the State Dr. Goldberg's CV. I'm familiar with Dr. Goldberg so I'm not concerned about the arrival of the CV and later on Monday and later last night I received several articles, presumably that Dr. Goldberg would rely upon in terms of this. I received a letter from Dr. Goldberg addressing the following:
> "I have been asked to provide testimony regarding a case of a 15 year old male who was allegedly sexually assaulted. I am able to testify to the question of whether a male can have an erection and ejaculate during sexual assault * * *. I base my opinion on review of the literature and clinical experience."

Defense counsel went on to clarify that he was "not arguing discovery violation;" but he added that he was "saying it is late." He stated that he was "scrambling to prepare voir dire examination, opening strategy, whole nine yards, and now I have to deal with this issue and I have asked this Court not to allow it given the lateness of this particular disclosure." He did acknowledge that the prosecutor had put him on oral notice that she would be "pursuing this" but that "[n]othing was definitive at the time * * *."

Defense counsel contended that Dr. Goldberg's testimony should not be permitted because it was an expert medical opinion, involving "complicated medical journal articles" that he would have to review; he added that he would have a "limited opportunity to consult with [his] own medical professionals * * *." He averred that it put the defense "at a significant disadvantage * * *." Defense counsel further posited that the testimony invaded the province of the jury and would "potentially" constitute bolstering.

In response, the prosecutor conceded that the disclosure was late, but she stated that she had contacted defense counsel two weeks prior and put him on notice that the state was "actively seeking" such testimony. She stated that "it was clear" in that earlier conversation with defense counsel that she "would be calling a doctor for that very purpose to show during a sexual assault [an] individual male can get an erection and ejaculate * * *." She added that, if defense counsel wanted "until Monday" to prepare for Dr. Goldberg's testimony, she would not object because it would not be an "unreasonable request * * *."

It was further the prosecutor's representation that Dr. Goldberg would not testify as to whether the specific alleged incident at issue in this case was consensual or not; however, the doctor would testify with respect to the male anatomy that males "can have and maintain erection in response to stimuli, touching, or other events which are not sexual in nature." She would be talking in "general terms" and would

be "simply explaining the anatomy of the human body [in] that there are censors [*sic*] in the penis that when touched regardless of whether it is wanted or unwanted touching an individual can become erect." In further explaining why she believed that Dr. Goldberg's testimony would be helpful to the jury, the prosecutor also pointed to the fact that there were five male members of the jury but none of the five had ever been a victim of sexual assault and thus "never subject to erection during sexual assault and I think that is difficult to grasp." She added that she did not think the "female jurors will understand * * *."

The trial justice, in assessing whether or not to admit Dr. Goldberg's testimony, noted that "exclusion is a drastic remedy" and the "Supreme Court doesn't like it * * *." The trial justice suggested that he limit Dr. Goldberg's testimony by not allowing her to "bolster[ ] her opinion with literature" but permit her only to testify based on her "training, her experience, her understanding of those anatomical issues * * *." Then he asked counsel the following: "How about if I don't have her testify until Thursday afternoon so if you need time if I can limit her in that way[.] * * * Do you care when she goes on?" Defense counsel responded: "I don't, Judge." The trial justice then asked a second time if Thursday would be acceptable and defense counsel stated: "That is fine."

The trial justice then stated that it was his ruling that Dr. Goldberg was "not permitted to state the foundation for her opinion" but must rely only on her

education, training, and experience. He also decided not to have Dr. Goldberg testify until Thursday, June 15, 2017. The trial justice deemed his decision to be a "fair balancing of the interest of both sides."

Defense counsel subsequently asked if Dr. Goldberg was going to give her opinion "that a male penis can respond to stimulation despite a coercive environment?" When the trial justice answered him in the affirmative, defense counsel stated that he did not "anticipate having follow-up questions." He added that he was "happy to do a stipulation and save the State some money in terms of paying Dr. Goldberg."

Thereafter, the trial testimony ensued.

## C

### The Trial Testimony

### 1. The Testimony of Jasper

Jasper testified that he was twenty-nine years old at the time of his testimony at trial. He stated that he had lived in Cranston for about seventeen years before living in East Providence. He testified that, when he was around eleven or twelve and living in Cranston, his parents divorced. It was his testimony that, after the divorce, "I didn't see my dad a lot. I saw him every other weekend, if that. My mom was drinking heavily."

It was further his testimony that, at about the same time, when he was approximately eleven or twelve, he "became close" with his neighbor, Mr. Sheridan, after doing odd jobs for him. Jasper added that, at the time about which he was testifying, he thought Mr. Sheridan was in his thirties. He further testified that the two "became really close" because his father "wasn't like around a lot so [he] kind of looked up to [Mr. Sheridan] like a father figure." He added that Mr. Sheridan taught him how to do "manual labor stuff," helped him with homework, and took him to the gym. He testified that he eventually spent every day with Mr. Sheridan. He further added that Mr. Sheridan was "doing everything that [his] dad should have been doing;" and, he stated that he loved Mr. Sheridan. Jasper also testified that Mr. Sheridan got him accepted into a private high school in Rhode Island and that Mr. Sheridan paid the tuition in exchange for a piece of property that Jasper's mother owned on Prudence Island.

It was Jasper's testimony that, after they would go to the gym, Mr. Sheridan would give him massages; he added that, if his legs were sore, Mr. Sheridan would make him take off his pants and would "throw a towel" over him. He stated that Mr. Sheridan "frequently" used what they called "tickle fingers where he used the tips of his fingers to caress my back or my neck or rub my head." He added that Mr. Sheridan told him that it was "what [he] needed to know" about how to "treat women

right and caress them * * *." Jasper testified that it was "weird" and "awkward * * *."

It was further Jasper's testimony that, at the end of his freshman year in high school, when he was fifteen years old and on the verge of turning sixteen, Mr. Sheridan asked him to go with him to "Upstate New York" to work at a Boy Scout camp for the Summer. It was Jasper's testimony that, when they were at the camp (prior to his sixteenth birthday), Mr. Sheridan told him that they had to "go home for something." Jasper added that they returned to Cranston on a Saturday; he further stated that, because they were leaving early the next morning, he stayed at Mr. Sheridan's home overnight. He stated that he woke up in the "middle of the night" and Mr. Sheridan was "laying across me on my, across my stomach and with his arm over me I was underneath his, underneath like his upper body and his armpit and he had me like pinned on the ground and he was, he used the weight of his body to hold me down while he performed oral sex on me." He added that, at that age, he was "very scrawny" and that Mr. Sheridan was the "stronger person physically[.]" He stated that, while the alleged assault was occurring, Mr. Sheridan told him that "the first time was supposed to be memorable and special." He further testified that he told Mr. Sheridan "no" and told him to stop more than once. He added that he tried unsuccessfully to get up and that he did not say yes and did not "want it at all[.]" Jasper stated that he felt "helpless," "terrified," and "betrayed."

Additionally, Jasper explained at trial that he did "bec[o]me aroused" because it was a "[n]atural reaction." He added that he eventually ejaculated and Mr. Sheridan got up, went to the bathroom, and then went to bed.

It was his testimony that the next morning they returned to the Boy Scout camp, and he stated that, at that time, he still loved Mr. Sheridan; he added that Mr. Sheridan was still helping him with getting into college and went to his swim meets and sporting events. It was his testimony that the alleged assaults continued when they were alone; and he specifically testified that, over an almost three-year period, it happened over one hundred times. (On cross-examination, Jasper admitted that he obtained an erection and ejaculated each time that Mr. Sheridan allegedly abused him.) He added that he did not want it to happen nor did he ever say yes or invite the sexual contact. It was his testimony that the alleged assaults stopped when he was eighteen and began dating his first girlfriend.

It was Jasper's testimony that he eventually disclosed the alleged assaults to one of his best friends, who was dating his sister. His testimony also reflected that he thereafter reported Mr. Sheridan's actions to the state police.

On cross-examination, Jasper acknowledged that he went to Mr. Sheridan's home, slept over, and took naps there during the period when the alleged assaults were occurring.

## 2. The Testimony of Dr. Amy Goldberg

Doctor Goldberg testified that she was employed as a pediatrician at Hasbro Children's Hospital with a subspecialty in the area of child abuse and neglect. Doctor Goldberg was qualified as an expert at trial.[4] She explained as follows during her testimony at trial: "[T]here are two ways that a penis can become erect. The first way is psychogenetic, so centrally mediated through the brain. That is one way. The other way, the second way is through tactile stimulation, so touching, rubbing any type of friction can also result in an erection."

She further explained that psychogenetic meant "having a sexual thought or imagine, erotic thought or imagining also cause an erection." She then proceeded to expound that "tactile stimulation alone can result in a penis becoming erect and subsequently ejaculating so without central mediation through the brain through the psychogenic piece of that process the penis can become erect and ejaculate." Doctor Goldberg testified that, in infant males, young males, and adolescent males, "simple examination, simple touch or moving the penis, even moving the testicles, not

---

[4]     We note that defense counsel further preserved his objection to Dr. Goldberg's testimony immediately after she was qualified as an expert. He was asked by the trial justice if he was referring to "timing" and "relevancy" as the basis for his objection, and he responded in the affirmative. The trial justice reiterated that he had delayed the doctor's appearance until that day and had limited the materials upon which the doctor could rely in giving her opinion to "traditional education experience background, skill, [and] training * * *."

examining the penis and only touching the testicles, the penis often becomes erect." She referred to patients who are "brain dead," and she referenced the fact that sperm can still be "harvested" from those individuals "purely through tactile stimulation" as an example in support of her testimony. She further cited the fact that an erection can occur when "changing a baby's diaper, cleaning a baby off, helping a child with the toilet, a full bladder can cause erection as well * * *." Doctor Goldberg then proceeded to explain that "ejaculation occurs after there is enough stimulation * * * to the penis itself."

Finally, she testified that it was her opinion, to a reasonable degree of medical certainty, that an adolescent male can become erect and ejaculate in response to an unwanted touching or sexual assault. Importantly, she also testified that she had not seen Jasper for any examination or treatment and that she did not "even know if there was a touching or what type of touches there [were] or [were] alleged[.]"

Defense counsel did not cross-examine Dr. Goldberg. The state then rested.[5] The defendant did not testify at trial or present any witnesses.

---

[5] One of Jasper's brothers, one of Jasper's friends, and Detective Brian Macera of the Rhode Island State Police also testified at trial. However, for the purposes of this appeal, we need not recount their testimony.

## D

## The Jury Verdict and Sentencing

On June 19, 2017, the jury found Mr. Sheridan guilty on the one count of first-degree sexual assault against him.  On June 26, 2017, Mr. Sheridan filed a motion for a new trial, which was denied.  Mr. Sheridan was sentenced to twelve years, with three years to serve and the remainder suspended, with probation.  He was further directed to have no contact with Jasper, to register as a sex offender, and to enter into sex-offender counseling.  Mr. Sheridan filed a timely notice of appeal.[6]

## II

## Standard of Review

It is well settled that "[t]he admissibility of evidence is a question addressed to the sound discretion of the trial justice and will not be disturbed on appeal absent a clear abuse of that discretion."  *State v. Rathbun*, 184 A.3d 211, 215 (R.I. 2018) (internal quotation marks omitted); *see State v. Rivera*, 221 A.3d 359, 367 (R.I. 2019).  Similarly, "[t]he discovery ruling of a trial justice will not be overturned absent a clear abuse of discretion."  *State v. Marte*, 92 A.3d 148, 151 (R.I. 2014) (internal quotation marks omitted); *see State v. Washington*, 189 A.3d 43, 62 (R.I.

---

[6]     Mr. Sheridan filed his notice of appeal prior to the entry of the judgment of conviction and commitment in this case.  However, we have stated that "we will overlook[ ] the premature filing of a notice of appeal."  *State v. Beaudoin*, 137 A.3d 726, 731 n.3 (R.I. 2016) (internal quotation marks omitted).

2018) ("When reviewing a trial justice's decision with respect to whether a violation of Rule 16 * * * occurred, this Court affords great deference to the trial justice and will not disturb that ruling unless he or she has committed clear error.") (internal quotation marks omitted); *see also State v. Adams*, 161 A.3d 1182, 1197 (R.I. 2017).

## III

## Analysis

## A

### The Testimony of Dr. Goldberg

### 1. Lateness

Mr. Sheridan contends on appeal that the trial justice abused his discretion in allowing Dr. Goldberg to testify because the state's disclosure was "tardy * * *." He specifically states: "[N]o trial attorney should be put in the position [Mr.] Sheridan's counsel was put in by the state's actions with Dr. Goldberg's proposed testimony. Fair is fair: this was unfair." He points out that the "state offered no justification whatsoever for its delay in making the disclosure * * *."[7] He further avers that the state's action resulted in prejudice to him. Additionally, Mr. Sheridan posits that the

---

[7]     We note that there is absolutely no evidence in this case to show, nor does defendant argue, that the prosecutor *intentionally* withheld the disclosure of Dr. Goldberg as an expert witness.

trial justice "did not offer a continuance of the trial as a remedy nor seems to have considered this as an option."[8]

We begin by noting that Mr. Sheridan's contention on appeal that the state's disclosure of Dr. Goldberg as an expert witness was not only late but was also insufficient is waived; defense counsel specifically said to the trial justice that he was not alleging a discovery violation, but only lateness. *See State v. Hallenbeck*, 878 A.2d 992, 1017-18 (R.I. 2005); *State v. Burke*, 574 A.2d 1217, 1224 (R.I. 1990).

To the extent that Mr. Sheridan's objection with respect to the lateness of the disclosure at issue is preserved, we do not perceive any reversible error.

"It is well settled that Rule 16 requires that discovery be made in a timely manner * * * in order that defense counsel may marshal the information contained in the discovery material in an orderly manner." *Adams*, 161 A.3d at 1197 (internal quotation marks omitted); *see State v. Huffman*, 68 A.3d 558, 568-69 (R.I. 2013);

---

[8] Lastly, Mr. Sheridan contends that the trial justice's "accommodation did not prevent or ameliorate the prejudice to [Mr.] Sheridan: it compounded it." He adds that Dr. Goldberg's examples during her testimony did not include situations involving force or coercion and, therefore, she could only have derived her opinion from medical literature. He further avers that the trial justice's remedy "prevented legitimate cross-examination of the real foundation to her opinions—the medical literature." Defense counsel did not raise such an argument before the trial justice; indeed, the crux of his complaint about the late disclosure of Dr. Goldberg's testimony (which complaint formed the basis for the trial justice's remedy) was that he would not be able to review and assess the "complicated medical journal articles" which formed a portion of the basis of her opinion. Thus, this contention is waived. *See State v. Hallenbeck*, 878 A.2d 992, 1017-18 (R.I. 2005); *State v. Burke*, 574 A.2d 1217, 1224 (R.I. 1990).

*State v. Simpson*, 595 A.2d 803, 807 (R.I. 1991). Indeed, we have stated that "[i]n our adversary system, based as it is upon a single trial held on a single occasion, it is imperative that the defense come to trial as well equipped as possible to raise reasonable doubt in the minds of one or more of the jurors." *State v. Rainey*, 175 A.3d 1169, 1179 (R.I. 2018) (internal quotation marks omitted); *see also Simpson*, 595 A.2d at 808 ("Trial lawyers must be able to adapt strategy to evolving circumstances. They must be able to think upon their feet. However, very few trial lawyers are superhuman. When, because of a failure to furnish discovery on the part of the state, a highly significant piece of information, hitherto unexpected, becomes available and when that information has a potential to alter the course of the defense completely, counsel is reasonably entitled to an effective remedy."). But we note that we have also stated that "the sanction of excluding testimony is an extreme and drastic remedy which should be exercised with caution and restraint." *Rainey*, 175 A.3d at 1181 (internal quotation marks omitted).

Moreover, we have frequently opined that the trial justice is "in the best position to fashion a proper remedy for noncompliance with the discovery rule * * *." *Id.* at 1181-82 (internal quotation marks omitted); *see also State v. Coelho*, 454 A.2d 241, 245 (R.I. 1982). In so doing, the trial justice "must consider what is right and equitable under all of the circumstances and the law." *Coelho*, 454 A.2d at 245 (internal quotation marks omitted); *see also Adams*, 161 A.3d at 1197.

"[T]he trial justice should take into account: (1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." *Coelho*, 454 A.2d at 245. We will not reverse a trial justice's decision in this regard absent clear error or an abuse of discretion. *Marte*, 92 A.3d at 150.

It is quite clear to us that there was no such clear error or abuse of discretion in this case. The trial justice fashioned a remedy for the late disclosure of Dr. Goldberg as an expert witness that he deemed to be a "fair balancing of the interest of both sides." And, importantly, defense counsel never expressed any disagreement with the trial justice's remedy; nor did he request any continuance beyond the continuances that the trial justice ordered. Indeed, it appears from the record that defense counsel was satisfied with the remedy and acquiesced in it.[9] Thus, we see absolutely no basis to conclude that the trial justice abused his discretion in allowing Dr. Goldberg to testify to some extent while also significantly limiting the basis of her testimony to her training and experience and delaying her testimony until Thursday. *See Rainey*, 175 A.3d at 1180-81 ("[I]t is our opinion that the trial justice

_____

[9]     We note that, at the hearing on Mr. Sheridan's objection to Dr. Goldberg's testimony, the prosecutor mentioned that the state would have no objection to delaying Dr. Goldberg's testimony until the following Monday. However, defense counsel opted not to take the prosecutor up on that offer by requesting a further continuance from Thursday to Monday.

did not abuse his discretion in failing to craft an alternative remedy when there was no notice given to him that his original remedy might be inadequate.").

We would further note that the remedy fashioned by the trial justice in this case accorded defense counsel some genuine relief. Counsel had expressed his concern about having to review the "complicated medical journal articles" which would constitute the basis of Dr. Goldberg's testimony. The trial justice consequently limited Dr. Goldberg's testimony by refusing to allow her to testify with respect to any medical journal articles and requiring that she base her testimony purely on her education, training, and experience. Furthermore, the trial justice delayed Dr. Goldberg's testimony until Thursday, making Dr. Goldberg the last witness to testify at the trial (without any request for a further continuance having been made by defense counsel). Doctor Goldberg's testimony was very short, and she commented only upon what was physically possible regarding the male anatomy; she also specifically stated that she had not seen Jasper for any examination or treatment. What is more, defense counsel elected not to cross-examine Dr. Goldberg.

For all of the above-stated reasons, we do not detect any abuse of discretion by the trial justice with respect to the remedy which he fashioned in reaction to the

prosecutor's distressingly late disclosure of the fact that Dr. Goldberg would be testifying. *See Marte*, 92 A.3d at 150-51.[10]

## 2. Invading the Province of the Jury

Mr. Sheridan further contends on appeal that the trial justice abused his discretion when he admitted Dr. Goldberg's testimony because, in Mr. Sheridan's view, it invaded the province of the jury. He avers that "how the male penis reacts to different stimuli was well-within the province of the jurors' knowledge, without the need for Dr. Goldberg's testimony and opinion."

Rule 702 of the Rhode Island Rules of Evidence provides as follows:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

"We previously have stated that the jury will benefit from expert testimony when the subject matter of the inquiry is one involving special skills and training beyond the ken of the average layman." *State v. Roscoe*, 198 A.3d 1232, 1240 (R.I. 2019) (internal quotation marks omitted); *see State v. Wheeler*, 496 A.2d 1382, 1388 (R.I. 1985) ("The law and practice of this state on the use of expert testimony has historically been based on the principle that helpfulness to the trier of fact is the most

---

[10]   While we have no hesitation about approving the remedy fashioned by the trial justice in this case to deal with the late disclosure of an expert witness, we nonetheless would express our disapproval of such a belated disclosure.

critical consideration."); *see also Morabit v. Hoag*, 80 A.3d 1, 11 (R.I. 2013). However, "[i]f all the facts and circumstances can be accurately described to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as is the expert, there is no necessity for the expert testimony." *Roscoe*, 198 A.3d at 1240-41 (internal quotation marks omitted); *see also Barenbaum v. Richardson*, 114 R.I. 87, 92, 328 A.2d 731, 734 (1974). We have also stated that, "[b]efore admitting expert testimony, a trial justice must consider whether the testimony sought is relevant, within the witness's expertise, and based on an adequate factual foundation. However, once these questions have been favorably determined, the evidence generally ought to be admitted." *State v. Botelho*, 753 A.2d 343, 347 (R.I. 2000).

After reviewing the record in this case and the relevant legal precedent, we are unable to perceive any basis for holding that the trial justice abused his discretion in admitting Dr. Goldberg's testimony. We are persuaded by the argument made by the prosecutor during the hearing in Superior Court that, while there were five male members of the jury, "none of the five male jurors ha[d] ever been a victim of sexual assault so never subject to erection during sexual assault * * *." What is more, she also pointed out that she did not think that the "female jurors w[ould] understand * * *." It seems clear to this Court that Dr. Goldberg's professional opinion, to a reasonable degree of medical certainty, that an adolescent male can

become erect and ejaculate in response to an unwanted touching or sexual assault was "beyond the ken of the average layman," whether male or female.[11] *Roscoe*, 198 A.3d at 1240 (internal quotation marks omitted). In our judgment, Dr. Goldberg's testimony aided both the male and the female members of the jury in determining whether or not Jasper consented during the specific instance of alleged sexual assault which formed the basis of the charge against Mr. Sheridan in this case. *See Wheeler*, 496 A.2d at 1388. As such, her testimony did not invade the province of the jury.

Accordingly, the trial justice did not abuse his discretion in admitting Dr. Goldberg's expert testimony.[12]

## B

### *Voir Dire*

Mr. Sheridan contends on appeal that the trial justice erred in permitting the prosecution to refer to Jasper as the "victim" during jury selection. He avers that "[t]he interlacing of the prosecutor's reference to [Jasper] as the 'victim' with

---

[11] We note as well that attempting to portray Dr. Goldberg's testimony as merely stating that "anything is possible," as Mr. Sheridan attempts to do, is not a fully accurate representation of that testimony.

[12] We consider it worth mentioning that, as we have instructed, the trial justice in this case specifically gave "due consideration to the natural tendency of jurors to place greater weight on the testimony of one qualified as an expert." *State v. Wheeler*, 496 A.2d 1382, 1388 (R.I. 1985) (internal quotation marks omitted).

references to other 'victims' of a crime, sexual abuse, and sexual assault was improper and could only have prejudiced the jury against [Mr.] Sheridan." He claims that his initial objection to the use of the word "victim" with respect to Jasper was sufficient to preserve the issue for appeal. Furthermore, he claims that he need not have objected to the composition of the jury because his objection was actually to the bias created by the prosecutor's use of the word "victim" as it related to Jasper and not to the composition of the jury.

We disagree. After a review of the record, we consider Mr. Sheridan's argument in this regard to be waived. It is true that Mr. Sheridan did object initially to the use of the word "victim" as it related to Jasper, but he failed to object to the three occasions thereafter during *voir dire* when the prosecutor referred to Jasper as the "victim." Moreover, he failed to move for a mistrial or request a curative instruction; and, at the close of *voir dire*, defense counsel represented that the jury was satisfactory to Mr. Sheridan, without any further comment. *See State v. Monteiro*, 924 A.2d 784, 792 (R.I. 2007) ("To preserve an issue for appellate review, a defendant must object and move for a mistrial or request a cautionary instruction."). As such, this issue is waived.[13]

---

[13] We would note additionally that Mr. Sheridan takes issue, on appeal, with *all* the uses of the word "victim" by the prosecutor after the initial objection during jury selection. However, it is clear to this Court that the objection and the ruling of the trial justice were specific to the use of the word "victim" when referencing Jasper, not to the use of the word in contexts that did not refer directly to Jasper.

Accordingly, we are unable to perceive any abuse of discretion on the part of the trial justice in this case and, as such, we affirm the judgment of conviction and commitment.

## IV

## Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court. We remand the record to that tribunal.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Matthew Sheridan. |
| **Case Number** | No. 2018-234-C.A.<br>(P1/16-1542A) |
| **Date Opinion Filed** | June 24, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State:<br><br>Mariana E. Ormonde<br>Department of Attorney General<br>For Defendant:<br><br>Lauren E. Jones, Esq. |